Argued October 11, reversed and suit dismissed November 20, 1923.

# ELIZA C. DOLPH *v*. LENNON'S, INC., A CORPORATION, A. J. LENNON, CHARLES F. BERG AND SWEET SIXTEEN COMPANY, A CORPORATION.

(220 Pac. 161.)

**Appeal and Error—Party not Appealing cannot Insist on More Favorable Decree.**

1. A party not appealing cannot insist on a more favorable decree on appeal by the adverse party, though the case is triable *de novo* in the Supreme Court.

**Reformation of Instruments—Decree Held Judicial Determination That Terms Omitted from Lease were not Part of Original Contract.**

2. Where a lease as reformed by a decree contained no covenant that the premises should be used exclusively by lessee for its own business, the decree was a judicial determination that no such terms were part of the original contract.

**Reformation of Instruments—Instrument cannot be Reformed by Insertion of Agreement not in Parties' Minds When Contract was Made.**

3. Written instrument can only be reformed to conform to the parties' agreement, and the court cannot insert any stipulation or agreement not in the parties' minds when they made the contract.

**Reformation of Instruments—Finding of Agreement not to Assign or Sublet Held not Supported by Evidence.**

4. In a suit to reform a lease, evidence *held* insufficient to support a finding that lessee agreed not to assign or sublet without lessor's written consent.

**Landlord and Tenant—Lessee's Estate is Assignable Unless Power is Restrained by Terms of Lease.**

5. Generally a power of assignment is incident to lessee's estate unless restrained by the terms of the lease, which is a contract creating an estate assignable at common law without the word "assigns" in the lease.

**Landlord and Tenant—Restrictions Against Assignments must be Clearly Established and Strictly Construed.**

6. Restrictions against assignments, being restraints against alienation, are not favored by the courts, which should not insert such a clause in a lease without clear and convincing evidence of a previous definite agreement on the particular point, and will construe it, when found therein, with the utmost strictness.

**Reformation of Instruments—Statements of Reasons for Desiring Lease Held Insufficient to Authorize Insertion of Provision Against Assignment or Subletting.**

7. A statement by lessees' representative in negotiations for a lease that lessees desired the building for their own business, and expected to improve it by large expenditures, *held* insufficient to authorize insertion of a provision against assignment or subletting without lessor's written consent, not being part of the consideration for, but merely a statement made as an inducement to lessor to execute, the lease.

**Fraud—Mere Nonperformance of Promise not Actionable.**

8. Mere nonperformance of a promise made, or failure to carry out an intention expressed, in the course of negotiations, is not a fraud or evidence of fraud, unless the representations were falsely and fraudulently made with intent to deceive; a representation as to a past fact or present condition being necessary to constitute actionable fraud.

**Reformation of Instruments—Lessee Held not Guilty of Fraud in Accepting Lease Without Pointing Out Omission of Provision Agreed on.**

9. A lessee and its representative, neither of whom was represented by an attorney in negotiations for the lease, which was drawn by lessor's attorney, *held* not guilty of fraud in accepting and signing it without pointing out omission of a provision which lessor claimed was agreed on.

**Reformation of Instruments—Subletting cannot be Made Basis of Reformation of Lease on Ground of Fraud.**

10. The subletting of premises by lessee cannot be made the basis for reformation of the lease on the ground of fraud, by inserting a provision against subletting, especially where it occurred more than two years after the lease was made.

**Reformation of Instruments—Testimony as to Mutual Mistake must be Clear, and Show Precisely What was Intended to be Inserted.**

11. To obtain reformation by insertion of omitted provisions, testimony as to mutual mistake must be clear, definite, cogent and unequivocal, and must show precisely what was intended to be inserted.

**Reformation of Instruments—Instrument not Conforming to Contract Because of Mutual Mistake or Mistake of One and Fraud of Other Party Reformed.**

12. Where a written memorandum fails to conform to the contract because of mutual mistake, or mistake of one party and fraud of the other, a court of equity will generally reform the instrument to make it conform to their actual stipulation.

---

11. Sufficiency of evidence to warrant reformation of instrument on ground of mutual mistake, see note in 19 Ann. Cas. 343.

Evidence—Reformation of Instruments—Every Presumption in Favor of Correctness of Writing—Clear and Convincing Proof of Facts Alleged in Complaint Necessary.

13. Every presumption must be invoked in favor of the correctness of a written instrument, which will not be reformed except on clear and convincing proof of the facts alleged in the complaint.

Reformation of Instruments—Court Should Consider Equitable or Inequitable Features of Clause Sought to be Inserted.

14. A suit for reformation is an appeal to an extraordinary power of a court of equity, which should scrutinize a clause sought to be inserted in the writing and consider its equitable or inequitable features.

Reformation of Instruments—Nonassignment Clause in Long Term Lease Without Restriction on Lessor's Power to Withhold Consent Does not Appeal to Court's Conscience.

15. A nonassignment clause sought to be inserted in a long term lease with no restriction on lessor's power to withhold consent to a subletting does not appeal to the conscience of a court of equity, especially where subtenant is a responsible concern satisfactory to lessor, who only desires to obtain an increased rental.

Reformation of Instruments—Lessor not Suggesting Omitted Provisions When Contract was Made cannot Do so in Suit to Reform Lease.

16. Lessor not suggesting or insisting on provisions against assignment and subletting without her written consent when the contract was made cannot do so in a suit to reform the lease; lessee's assent to such provisions being necessary to make them part of the contract.

From Multnomah: T. E. J. Duffy, Judge.

Department 2.

The plaintiff, Mrs. Eliza C. Dolph, instituted this suit against the appellants, Lennon's, Incorporated, A. J. Lennon, Chas. F. Berg and the Sweet Sixteen Company, a corporation, to obtain the reformation of a lease of certain premises situated on Broadway Street, in the City of Portland, Oregon. In this lease, which was dated March 10, 1919, the plaintiff, Mrs. Dolph, was lessor and the appellants, Lennon's, Inc., was lessee. Lennon's, Incorporated, subsequently assigned the lease to A. J. Lennon and Chas. F. Berg, its principal stockholders; and February 11, 1921,

Lennon and Berg sublet the premises to the Sweet Sixteen Company at a considerable rental advance.

At the time the lease was executed the property was yielding a rental of $900 per month. The lease called for a monthly rental of $1,500 per month and covered a period of ten years but was not to go into effect, in so far as possession was concerned, until two years after it was executed. The plaintiff sought by her complaint, to reform the lease so as to insert (1) a provision limiting the use of the premises to Lennon's, Inc., and (2) a provision explicitly denying to the lessee the right to assign, or sublet without the written consent of the plaintiff. The trial court rendered a decree refusing to insert the first provision mentioned, in effect, denying relief in so far as the insertion of the clause requiring Lennon's to conduct its own business on the premises was concerned, and reforming the lease so as to prevent an assignment thereof, to the effect that the premises should not be sublet or assigned without the written consent of the plaintiff first had and obtained. After decreeing that the lease should be so reformed the trial court adjudged that the lease as reformed was valid; that the sublease to the Sweet Sixteen Co. was valid, and then adjudged that the Sweet Sixteen Company should pay the rental of $2,500 per month fixed by the sublease, directly to the original lessor, Mrs. Dolph. Lennon's, Incorporated, A. J. Lennon and Chas. F. Berg appealed from the decree.

The Sweet Sixteen Company was satisfied with the decree. Mrs. Dolph was also satisfied and neither appealed.

The allegations of the complaint which explain the issues, and the gist of which are denied by the answer, are as follows:

"That within a few days prior to March 10, 1919, defendant above named, Lennon's Incorporated, through the above named defendant, Charles F. Berg, its then vice-president, applied to the plaintiff herein for a lease of the premises hereinabove described, and at said time in order to induce plaintiff to lease said premises to the defendant, Lennon's Incorporated, promised and agreed with plaintiff that said defendant would use the said premises under said proposed lease for its own purposes exclusively, and promised and agreed to conduct in said premises under said proposed lease, and under its name, 'Lennon's Incorporated,' the business then carried on by said defendant corporation, in its then place of business on the north side of Morrison Street, between Fifth Street and Sixth Street, in the said City of Portland, but upon a larger and more important scale and the said Charles F. Berg, representing and acting for and on behalf of said defendant corporation as aforesaid, then and there represented that the principal business of said defendant corporation in case of securing said proposed lease, as applied for, was thereafter and with the commencement of the term of said lease to be carried on by it in said hereinbefore described premises, owned by plaintiff as aforesaid, and that to enable it to carry on and conduct therein the business that it was then carrying on in its said store on Morrison Street, it would expend between $35,000 and $40,000 in remodeling said building so as to make it convenient for its own use.

"That in negotiating for said lease from the plaintiff to said defendant, and in the final consummation thereof, and to induce plaintiff to execute said lease to said defendant, Lennon's Incorporated, said defendant amongst other things, promised and agreed that said premises should be used exclusively during the term thereof by said defendant, Lennon's Incorporated, for the purpose of conducting its own business only, therein, and that said premises would not be sublet under the said lease, and that said lease

should not be assigned, without the written consent of the plaintiff first had and obtained and it was thereupon so agreed by and between the plaintiff and said defendant.''

The lease was drawn by Mrs. Dolph's attorney and as drafted did not contain either of the clauses claimed to have been agreed upon at the meeting to which the verbal understanding had been reached. There were present at the meeting in question Mrs. Dolph, Mr. Joseph Simon, Mr. Chas. F. Berg of Lennon's and one M. A. Newell, a real estate agent.

It was not contended that in the course of verbal negotiations there was any reference, whatever, to a restriction on assignment for subletting but it was claimed that such a restriction was inferable from Berg's statement that Lennon's intended to conduct on the premises the business which it was then conducting on Morrison Street in Portland. Mr. Simon stated that he dictated certain special clauses to his stenographer and then left to her the incorporation of what he termed ''boiler-plate'' provisions, one of which was a restriction against an assignment and subletting without consent; that he failed to notice that this restriction had been omitted as he went over it hastily. He then gave the lease to Mr. Newell who subsequently returned it signed by Lennon's. Mr. Simon further testified that it was his purpose to have included in the lease the usual restrictions covering the nonassignment and subletting without the written consent of the lessor. On cross-examination Mr. Simon testified as follows:

''Q. Was there any discussion at any time during the conference or was there any mention of assignment or subletting at the time of the conference between Newell, Berg and yourself; was there any

reference to assignments and subleases in that conference?

"A. Not in express language but the understanding was that the lease should be formulated and based upon the agreement that was entered into. * *

"Q. You never at any time intended to insert, and omitted by negligence of you or any stenographer, any clause affirmatively obligating them to conduct exclusively a certain business on certain premises for a certain period of time regardless of conditions? You never intended to dictate that, did you, Senator?

"A. No, I did not.

"Q. Another matter which I wish to ask you, with regard to the dictation of the lease outside of what you call the 'boiler-plate' portion. Did you intend to dictate in that lease as part of the agreement of the parties that Lennon's should improve that building, spend the sum of approximately thirty-five thousand dollars in making it into the store of the character or type of Magnons?

"A. No; I don't think there is any such provision.

"Q. I agree with you, there was not any such provision. Was it your intention to obligate the tenant to do that?

"A. No; that was one of the inducements Lennon's offered to Mrs. Dolph, to make the lease, but that didn't go in the lease.

"Q. It was a statement of their intention, was it not, Senator?

"A. Yes. * *

"Q. You didn't require them to make any improvement?

"A. Mrs. Dolph consented certain improvements be made.

"Q. But you did not require them?

"A. Not in the writing.

"Q. That was in conformity with the verbal agreement?

"A. Well, the verbal agreement was they were to make improvements. They said they would make

improvements to the extent of thirty-five or forty thousand dollars.

"Q. I mean, no mistake, the failure to require them to make any improvement?

"A. No; no mistake about that, because I didn't intend to put that in the lease."

Mrs. Elizabeth C. Dolph testified in part as to what took place at the meeting in Mr. Simon's office; that Mr. Berg of Lennon's desired to obtain the lease. He said that he wanted to greatly enlarge their business and establish a business as nearly as possible like Magnon's of San Francisco; that they wanted the building for their own use; that Mr. Berg said "Mrs. Dolph, if you will lease your building to us, to Lennon's, we will carry on a high-class business there that you will be proud of." She was to pay taxes, insurance and street improvements, and they asked her to let them have it for ten years; that at first she demurred to letting the building for ten years but afterward consented; that Mr. Berg assured her that he could not possibly take the building for less than ten years because he was going to expend something like $35,000 or more in the improvement of the building, making it suitable for their use. That this induced her to give the lease. She testified that nothing was said regarding the rights of Lennon's, Incorporated, to sublet or assign the lease and that she would not have leased the premises if any such right had to be granted; that she did not know how it happened that the provisions by which Lennon's were to occupy the premises exclusively for their own business, were left out and the prohibition against assigning and subletting was omitted and she did not know when she signed the lease that those restrictions were omitted.

The understanding of Mr. Newell, the real estate agent, in regard to the transaction, is indicated by his cross-examination, which is in part as follows:

"Q. I took down your statement. I want to know if that is correct or not: Mrs. Dolph asked Mr. Berg: 'What do you intend to do with the building?'

"A. Yes.

"Q. Mr. Berg told her it was their intention to occupy it for Lennon's Incorporated?

"A. Yes.

"Q. Is that the statement on which you base your conclusion that was her understanding?

"A. Yes, sir.

"Q. That is as far as you remember, was the language used?

"A. Yes, sir.

"Q. Was there any discussion about assigning or anything of that sort?

"A. About what?

"Q. About assignment of the lease?

"A. No, sir.

"Q. No discussion of that kind?

"A. No, sir.

"Q. Who drew that lease, do you know?

"A. Senator Simon, I think.

"Q. Whom did Senator Simon represent?

"A. Sir?

"Q. Whom did he represent?

"A. Mrs. Dolph."

REVERSED AND SUIT DISMISSED.

For appellants there was a brief over the names of *Messrs. Dey, Hampson & Nelson, Mr. Martin L. Pipes* and *Mr. George A. Pipes,* with oral arguments by *Mr. Roscoe C. Nelson* and *Mr. Martin L. Pipes.*

For respondent there was a brief and oral arguments by *Mr. Chester V. Dolph* and *Mr. H. J. Bigger.*

BEAN, J.—In regard to the clause which it was claimed in the complaint was omitted from the lease to the effect that Lennon's, Incorporated, should occupy the premises during the term of the lease exclusively for the conduct of its own business, we should first notice that the trial court found from the testimony, that such clause should not be incorporated in the lease, and the plaintiff being apparently satisfied with the decree did not appeal; therefore, that phase of the matter is out of the case.

1. A party who has failed to take an appeal cannot, on appeal by the adverse party, insist on a decree more favorable to him than that given in the court below, even though the case is triable *de novo* in the Supreme Court: *Flinn* v. *Vaughn,* 55 Or. 372 (106 Pac. 642); *McCoy* v. *Crossfield,* 54 Or. 591 (104 Pac. 423); *Goldsmith* v. *Elwert,* 31 Or. 539 (50 Pac. 867), and other cases referred to in these.

2. The decree appealed from ordered that the lease "be and the same is hereby reformed and corrected to conform to the real agreement of the parties thereto," then provided for inserting in the lease the following:

"It is further covenanted and agreed by and between the parties hereto that said party of the second part will not assign this lease, nor sublet said premises, nor any part thereof, without the consent in writing of the party of the first part had and obtained permitting the same."

The instrument as reformed by the decree of the trial court contains no covenant either that the premises should be used exclusively by Lennon's, Incorporated, for the purpose of conducting its own business only or for the conducting of the business formerly conducted at Morrison Street. The decree is a judi-

cial determination against the plaintiff, that no such terms were a part of the original contract.

3. The only question that remains is whether or not the testimony warrants the finding that the contracting parties to the lease agreed that the premises should not be sublet or the lease assigned without the written consent of the plaintiff, first had and obtained. It goes without saying that a written instrument can only be reformed so as to conform to the agreement made by the parties. The function of the written instrument is to record the agreement which the parties executing the same have made. If it was an oversight in not making any agreement as to subletting the premises or assigning the lease, then there could have been no mistake or oversight in omitting the insertion of such a clause in the written lease. The scrivener who drew the lease would not be expected to insert therein a stipulation that, in fact, had not been made by the parties. Neither is the court authorized to reform the instrument and insert therein any stipulation or agreement that was not in the minds of the parties at the time they made the contract.

4. We fail to find in the record any testimony to support the finding or decree of the trial court that the nonassignment clause and clause restricting the subletting of the premises was a part of the real agreement of the parties to the lease. There were four persons present at the negotiations when the verbal contract was consummated and the terms thereof fixed, Mrs. Dolph, Mr. Simon, Mr. Newell and Mr. Berg. All of these witnesses agree that the subject of assignment and subletting was not even mentioned at that time by either of the parties or anyone else.

The reason for the opinion of the trial court seems to have been that the agreement alleged to the effect that the premises were to be used by Lennon's, Incorporated, for its business only, and to conduct such a business as was conducted at Morrison Street, is equivalent to an agreement not to assign or sublet the premises without the written consent of the plaintiff.

If the defendant, Lennon's, Incorporated, did not agree as a part of the contract to occupy its premises for its business only or to conduct its business therein as conducted at Morrison Street, it cannot be said that they agreed to something claimed to be equivalent, namely, not to assign or sublet the premises. We should not translate words used in the negotiations which were not a term of the contract into other words constituting a contract. If we change the phraseology it must mean the same thing as the original language. The new language inserted in the written instrument by the decree is radically different from the original. It is not susceptible of the same meaning as the original language used by the parties in the negotiations and was not so understood by both of them. Therefore, there is no basis for the decree because there is no evidence supporting the finding that an agreement was made that the lease should not be assigned and the premises should not be sublet without the written consent of the lessor.

According to the facts in the case as delineated by the testimony if the clause relating to the nonassignment of the lease, and the restriction as to the subletting of the premises had been inserted in the lease by the draftsman, then it would have amounted to no more than a proposal on the part of the lessor,

and would have required the acceptance of the lessee to consummate the agreement. This, of course, would have been accomplished by the execution of the lease with such an insertion. Whether the lessor and the lessee could have come to an agreement as to a restriction in regard to subletting if they had endeavored to do so, is in doubt. Mrs. Dolph testified that she would not have signed the lease if she had understood that there were no restrictions in regard to a sublease. On the other hand, Mr. Berg, the vice-president and representative of Lennon's, the lessee, testified that he would not have signed the lease containing the covenant that the lease should not be assigned, nor the premises sublet without the written consent of the lessor, unless there had been a further provision that such consent should not be arbitrarily withheld. So that it appears that the oversight was a failure of the parties to come to an agreement or understanding in regard to the covenant inserted by the decree, rather than in a mistake in making the written memorandum show what the parties had agreed to.

5. As a general rule, the power of assignment is incident to the estate of a lessee, unless it is restrained by the terms of the lease. Though a lease is necessarily a contract, yet it is a contract which creates an estate, and by the common law an estate is assignable, and the power to assign exists without the word "assigns" in the lease. It has been held that under an agreement for a lease the lessor is not, without an express stipulation, entitled to a covenant restraining alienation without the lessor's consent as a proper and usual covenant: 16 R. C. L. 828, § 323; *Church* v. *Brown,* 15 Ves. Jr. 258 (10 Rev. Rep. 74, 15 Eng. Rul. Cas. 688); *Hampshire* v.

*Wickens,* 7 Ch. Div. 555 (47 L. J. Ch. 243, 38 L. T. (N. S.) 408, 26 W. R. 491, 15 Eng. Rul. Cas. 699).

6. Restrictions against assignments being a restraint against alienation are not favored by the courts. Clear and convincing evidence of a previous definite agreement on the particular point is necessary to justify the insertion of such a clause in a lease and even where such clauses appear, they are construed with the utmost strictness in the interest of freedom of alienation: 16 R. C. L. 832, § 328. Tiffany on Landlord & Tenant, Section 152, page 221, says—

"Restrictions of this character, upon alienation by the lessee are not favored and are, it is said, to be construed strictly, and a particular mode of alienation is, it has been stated in a leading case on the subject, not to be regarded as prohibited unless it is 'by words which admit of no other meaning.' " See also, Id., § 46; *Goldman* v. *Feder,* 84 W. Va. 600 (100 S. E. 400, 7 A. L. R. 246).

Lord Chancellor ELDON, in the case of *Church* v. *Brown,* 15 Ves. 258, discussing this point said:

" * * nothing which flows out of that interest as an incident, is to be done away by loose expressions, to be construed by facts more loose; that it is upon the party, who has forborne to insert a covenant for his own benefit, to show his title to it; and that it is safer to require the lessor to protect himself by express stipulation, than for courts of equity to hold, that contracting parties shall insert, not restraints, expressed by the contract, or implied by law, but such, more or less in number, as individual conveyances shall from day to day prescribe, as proper to be imposed upon the lessee; and that, all those restraints, so imposed from time to time, are to be introduced as the aggregate of the agreement."

See also opinion of Lord THURLOW in *Henderson* v. *Hay,* 3 Brown Ch. 632.

7. The claim for the insertion of a nonassignable clause is practically based upon the statement made by Mr. Berg on behalf of Lennon's during the negotiations for the lease to the effect that they desired the building of Mrs. Dolph for the purpose of conducting their business which they had been conducting on Morrison Street, and that he expected to improve the building by the expenditure of $35,000 or $40,000. Neither of these matters was of a contractual nature. Both Mrs. Dolph and Mr. Simon say there was no mistake in regard to omitting from the lease any mention of Mr. Berg's statement that he expected to expend $35,000 or $40,000 on the property. Mr. Simon, who was attorney for Mrs. Dolph and who drew up the instrument, says that he had no intention of including a provision affirmatively requiring the premises to be used by Lennon's, although he thought that as a practical matter that would be the effect of a provision against assignment or subletting without written consent.

The reformation of the lease is therefore based upon loose language made by Berg during the negotiations and, although made in good faith and at that time it was the intention to occupy the building by Lennon's, subsequent circumstances caused a change in the plans. This statement was made as the reason why he desired to lease the premises and as an inducement to Mrs. Dolph to enter into the lease. It is not a part of the consideration for the contract. See *Philpot* v. *Gruninger,* 14 Wall. (U. S.) 570 (20 L. Ed. 743, see, also, Rose's U. S. Notes). Mrs. Dolph treats the assertion of Berg's as a promise.

8. The general rule, as stated in *Cerny* v. *Paxton & G. Co.,* 78 Neb. 134 (110 N. W. 892, 10 L. R. A. (N. S.) 640), is that ''fraud cannot be predicated on

a promise not performed; that, to constitute actionable fraud there must be a false assertion in regard to some existing matter, by which a party is induced to part with his money or property.'' The mere nonperformance of a promise made in the course of negotiations or the failure to carry out an intention expressed in the course of such negotiations is not of itself either a fraud or evidence of a fraud, in the absence of allegations and proof that the representations were falsely and fraudulently made with intent to deceive; that is, that the statement of intent as to the future was made in bad faith: *Adams* v. *Schiffer,* 11 Colo. 15 (17 Pac. 21, 7 Am. St. Rep. 202). See note, 10 L. R. A. (N. S.) 641. A representation, to be fraudulent in the legal sense, must relate to a past fact or present condition, and must not be a mere promise: *Casselberry* v. *Warren,* 40 Ill. App. 626; *Hartsville University* v. *Hamilton,* 34 Ind. 506; *Welshbillig* v. *Dienhart,* 65 Ind. 94; *Wheeler* v. *Mowers,* 16 Misc. Rep. 143 (38 N. Y. Supp. 950); *J. H. Clark Co.* v. *Rice,* 127 Wis. 451 (106 N. W. 231, 7 Ann. Cas. 505), and other cases cited in note to *Cerny* v. *Paxton,* 10 L. R. A. 641 et seq.

The defendant, Lennon's did not agree as a part of the contract to occupy the premises for its business only or to conduct its business thereon as conducted at Morrison Street. There is a marked distinction between the motive that may induce one to enter into a contract and the consideration of the contract. The fact that an intention expressed by the representative of Lennon's in the course of the negotiations was not carried out, or that the hopes or plans discussed did not eventuate is not of itself fraud or evidence of fraud. It cannot be made the basis of a suit for reformation, in the absence of

proof that the representations were falsely and fraudulently made with intent to deceive, that is, that the statement of intent as to the future was made in bad faith. It seems that Mr. Berg was absolutely sincere in explaining his reasons for negotiating the lease. It appears from the record that he went to great trouble and expense on behalf of Lennon's in procuring plans for carrying his wishes into execution. Impaired health and a disappointment as to his son, whom he expected to assist in the conduct of the business, altered the conditions, and these intentions expressed by him and referred to by Mrs. Dolph as "promises," could not be carried out.

9. The plaintiff in her complaint, as amended at the trial, after alleging that the error in the lease occurred through mutual mistake alleges that appellants were guilty of fraud in signing and accepting the lease as drawn, without pointing out that there was a provision omitted. The trial court appears to have adopted that view.

At the time the negotiations for the lease were had, the main part of which were at Mr. Simon's office, all of the interested parties assented to Mr. Simon drawing the lease. Neither Mr. Berg nor Lennon's, Incorporated, was represented by an attorney at that time. After the lease was drawn it was submitted to Mr. Berg and executed as drafted. It is not reasonable to hold or expect that Berg or anyone representing Lennon's should be required to notice provisions in the lease, or omitted from the lease, any more than Mr. Simon, who is considered to be an eminent, able and careful attorney. He represented Mrs. Dolph in the negotiations and suggested that the lessee offer $1,500 per month rental to the premises instead of $1,450. It seems clear to us that

there was no fraud either in the preparation or execution of the lease. The language of the court in the case of *Fulton* v. *Colwell,* 110 Fed. 54, seems pertinent to the case at bar.

"It is obvious that there can be no question of fraud respecting either the preparation or execution of this contract. It was drawn by Mr. Day, the attorney of the complainant, and was executed in his presence. * * The contract was fairly made, deliberately entered into by the parties, with full opportunity to become acquainted with its contents." See also 12 R. C. L. 254, § 21.

10. The subletting of the premises by Lennon's cannot be made the basis of reformation on the ground of fraud, for the reason it was not a fraudulent transaction nor a badge of fraud, moreover, it occurred more than two years after the making of the lease, "the fraud which will entitle the party to relief is fraud at the time of the execution of the instrument, and not in a subsequent and. distinct transaction." 23 R. C. L. 329, § 21.

11. To obtain reformation the testimony of a "mutual mistake" must be clear, definite, cogent and unequivocal and must show precisely what was intended by the parties to be contained in the instrument.

12. Generally, where a memorandum in writing fails to conform to the contract between the parties in consequence of their mutual mistake, or the mistake of one party, and fraud of the other, a court of equity will reform the instrument so as to make it conform to the actual stipulation of the parties: *Bradshaw* v. *Provident T. Co.,* 81 Or. 55–62 (158 Pac. 274); *Richmond* v. *Ogden St. Ry. Co.,* 44 Or. 48 (74 Pac. 333); *Bird* v. *Mayo,* 75 Or. 100–103 (144

109 Or.—23

Pac. 574, 145 Pac. 13, 146 Pac. 475); *Howard* v. *Tettlebaum,* 61 Or. 144 (120 Pac. 373); *Kraemer* v. *Alvord,* 97 Or. 227–231 (189 Pac. 990); 4 Pomeroy's Equity Jurisprudence (4 ed.), § 1376.

It is conceded that the concurrence of an excusable mistake of one party and fraud of the other is as potent to justify reformation as a mutual mistake. Plaintiff alleges in her complaint that " * * defendant, Lennon's Incorporated, signed and executed the said writing * * in the belief that it fully contained the above mentioned omitted parts," etc. After that in the complaint "plaintiff alleges that the defendant Lennon's Incorporated, at the time of the signing of the said writing, * * had full knowledge and notice that the said writing as signed did not express or declare the actual true and full agreement between the said plaintiff and the said defendant Lennon's Incorporated." There is a vast difference between mistake and fraud. One negatives the other. As we have heretofore stated we find there was no fraud in the execution of the lease. Mr. Simon says that he made a "mistake" in not noticing that his stenographer had overlooked a portion of the "boiler-plate" provisions. Mrs. Dolph says she read the lease over and thought it conformed to the agreement but was mistaken. There was no testimony, however, to show that Mr. Berg, who represented Lennon's, made any such mistake. But Mr. Simon and Mrs. Dolph both state that the subject of assigning and subletting, or restrictions thereon, was never discussed. It should be kept in mind that we are concerned solely with the nonassignment and subletting clause, since that is the only relief granted plaintiff, who does not appeal.

13. In the consideration of a case of this kind it should be borne in mind that every presumption is to be invoked in favor of the correctness of the instrument written. It is important that the sanctity of the written agreement be preserved: 23 R. C. L. 367, 368, § 67. It is an old-established rule in this state, which has been consistently followed, that an instrument will not be reformed except upon ''clear and convincing proof'' of the facts alleged in the complaint: *Remillard* v. *Prescott,* 8 Or. 37; *Epstein* v. *State Ins. Co.,* 21 Or. 179 (27 Pac. 1045); *Kleinsorge* v. *Rohse,* 25 Or. 51 (34 Pac. 874); *Thornton* v. *Krimbel,* 28 Or. 271 (42 Pac. 995); *Stein* v. *Phillips,* 47 Or. 545 (84 Pac. 793); *Smith* v. *Interior Warehouse Co.,* 51 Or. 578 (94 Pac. 508, 95 Pac. 499); *Sayre* v. *Moir,* 68 Or. 381 (137 Pac. 215); *Boardman* v. *Insurance Co. of State of Pa.,* 84 Or. 60 (164 Pac. 558).

Under the circumstances of this case, the casual statement of Mr. Berg, of Lennon's, during the preliminary negotiations as to what the lessee intended to do with the premises cannot be the basis for a legal mandate, forcibly incorporating into the lease a provision against assignment and subletting: *United States* v. *Milliken Imprinting Co.,* 202 U. S. 168 (50 L. Ed. 980, 26 Sup. Ct. Rep. 572, see, also, Rose's U. S. Notes); *Bower* ·v. *Bowser,* 49 Or. 182 (88 Pac. 1104); *Suksdorf* v. *Spokane P. & S. Ry. Co.,* 72 Or. 398 (143 Pac. 1104).

14, 15. A suit for reformation is an appeal to an extraordinary power of a court of equity. We should scrutinize the clause, sought to be inserted in the writing, and consider its equitable or inequitable features. What is asked is for all practical purposes a requirement that Lennon's, the lessee, do business on the premises for the term of the lease, ten years.

Defendant Berg, who made the negotiations for Lennon's, testified to the effect that he would not, and that no reasonable business man would have made such an agreement; that the lease was written exactly as the parties agreed. The nonassignment clause in a long term lease, with no restriction as to the arbitrary power of the lessor to withhold consent to a subletting of the premises, does not appeal to the conscience of a court of equity. It appears that prior to subletting the premises the parties were careful to ascertain that the Sweet Sixteen Co. was a responsible concern fully capable of carrying out the term of the lease and that the business in which they engage, in several cities, is no more hazardous than the business of Lennon's, in fact, is in a similar line, but more extensive. And that preparations have been made by the subtenant to greatly improve and beautify the building. The fact that the lessor appears to be satisfied with the new tenant, provided that the increased rental be paid to her, does not indicate that the lessor has been injured by the change of tenants. On the other hand, the payment of the rent reserved in her lease will be more secure for the term of the lease.

16. Mrs. Dolph had a perfect right at the time the contract in question was made to insist on a non-assignment clause and prohibiting or restricting the subletting of her premises; but before the matter would have become a contract the other contracting party would have had to assent to the proposition. The weakness of plaintiff's case in this respect is that she did not then insist upon or suggest such a stipulation and it was never made. It is too late for her to do so now. It follows that the decree of

the trial court must be reversed and the suit dismissed.

It is so ordered.

REVERSED AND SUIT DISMISSED.

McBRIDE, C. J., and BROWN and McCOURT, JJ., concur.