Argued March 24; reversed May 26, 1931

# CAMERON *v.* EDGEMONT INVESTMENT CO.
### (299 P. 698)

*W. B. Shively,* of Portland, for appellant.

*C. M. Hodges,* of Portland (Hodges & Gay, of Portland, on the brief), for respondent.

ROSSMAN, J. The following facts seem to be free from contradiction. The defendant is the owner of a residential subdivision of the city of Portland, entitled Terwilliger heights, which it was proceeding to sell through the agency of one N. B. Clarke. The latter established upon the tract a building which the plaintiff described as an "entertainment house," where, according to her testimony, a Mr. Hinkey lectured "about real estate values in Portland, and the great possibility of advance in price, and especially in that district where they were offering these lots for sale." Incidental to the lecture a lunch was served. The plaintiff, who was a teacher in Commerce High School of Portland, and who daily passed this property in going to and from her place of employment, received an invitation to attend the lecture. After she had accepted it a salesman named Farmer called at her school and conveyed her to Terwilliger heights in an automobile. We have already quoted in full her description of the lecture. Apparently at its conclusion, or during the course of her next visit to the property, she selected the lot described in her contract of pur-

chase and a few days later, when Farmer called upon her, attached her signature to the contract. We now revert to the portion of her testimony where she related the representations which she claimed induced her purchase. She testified:

"He told me that if I would go into this, that I would make five hundred dollars. I explained to him that I didn't have money enough to pay two thousand dollars, or $1,975 I think it was, so he said that I wouldn't have to pay that, I would pay a certain amount of payments, he didn't say definitely how many, and then the lot would be resold and I would make my profit, five hundred dollars.

"Q. You say he said he would make a profit of five hundred dollars on it for you?

"A. Yes, sir.

"Q. Did he say anything about a sale of this property?

"A. Yes. He said that that would happen within a certain length of time, he couldn't assure me just exactly how long, but I asked him about taxes and he said that I would never have to pay any taxes, the property would be sold before that time.

"Q. Well, what did he say about the resale of it?

"A. He said that after a certain time they would resell it, but they couldn't very well resell my lot at a higher price, when the lot next door hadn't gone up. For instance, my lot was $1,975, and if you are going to sell it for $2,475, you couldn't ask that for the lot next door to it when it hadn't sold for the higher price. He said they were selling in Burlingame, and after they were through there they would come back and resell on Terwilliger.

"Q. Was that the time that they were to resell your lot?

"A. Well, he didn't make any definite time. He said afterwards they would come back and they would sell my lot as soon as they possibly could. * * *

"A. He said I would have to make some payments, just a few payments, and then I would have the lot

sold for me. He assured me that I would not have to pay very much, because I explained to him that I wasn't in any position to go into anything to that extent, and he knew it, because he knew that I didn't have the money. * * *

"A. He said 'Miss Cameron, I will agree that I will make five hundred dollars for you on this lot.' I said, 'Well, I am not in a position—' those were my exact words, 'I am not in a position to go into this to this extent,' and he answered me and said, 'That is all right, you don't need to pay that much money, because your lot will be sold before that time, in a short time.' Those were his exact words, as far as I can say. * * *

"A. Yes; he said that he would resell, but that he couldn't resell my lot for an advanced price when the other lots hadn't gone up. It wouldn't look reasonable to the first buyers of these other lots, you see. However, he told me that a lot, two lots away from mine, had already been resold."

■ She also testified that Farmer told her that the price of this lot would be advanced to $2,375 the next week, that before October 1 a sewer would be installed, and a pavement would be laid. Likewise she swore that Farmer stated that "a number of houses would be put up there by spring." The plaintiff apparently made no effort to show that these four promises and prophecies had not been fulfilled beyond testifying that no more than two or three new houses had been erected since her purchase of this lot. Plaintiff's brief does not contend that the proof rendered these four representations actionable, and since the evidence entirely fails to disclose that either Farmer, Clarke, or the defendant knew the former's statements were false, when made, we shall disregard them and confine our efforts to the contention that the unperformed promise of resale is sufficient to substantiate the circuit court's decree.

There is no evidence whatever in the record that Farmer and Clarke did not honestly intend to keep the promise of resale. The defendant, however, frankly concedes that it never intended to resell the property and fortifies its statement with testimony that it never authorized Clarke, or any of his salesmen, to promise resales; in fact, its secretary testified that the moment when it received an intimation that Clarke's salesmen were promising resales it required him to have them desist therefrom. In *Sharkey v. Burlingame Co.*, 131 Or. 185 (282 P. 546), wherein a promise of resale, made under circumstances somewhat similar to those now before us was alleged to have constituted the instrumentality of deceit, we pointed out that authority to make such promise was outside of both the actual and apparent scope of the agent's authority. But we held that a rescission in favor of the purchaser and against the principal was justified when the evidence showed that although the principal was innocent at the outset he nevertheless received the benefit of the agent's fraudulent conduct and retained it after he had acquired knowledge of the manner in which the advantage had been obtained. That case also employed the principle that when the evidence proved that a promise, which the responsible party never intended to perform, was the deceptive factor which misled the complaining party, such false promise was capable of supporting a decree of rescission. These same principles of law were again employed in *Boyer v. Edgemont Investment Co.*, 135 Or. 161 (295 P. 471).

■■ But if the promise of resale was made on behalf of the agent only, and was so understood by the plaintiff, then the latter is confronted with a record, made

almost entirely by herself, which fails to show that the promissor did not intend to keep his promise. The plaintiff testified that both Farmer and the only other salesman in Clarke's employ to whom she spoke, one G. J. Baker, expressed themselves as being hopeful that a resale of her lot could soon be effected. Neither Farmer, Baker, nor Clarke testified in this suit and, hence, we do not know from them what they planned to do about reselling the property. Under the above circumstances, we are certainly justified in indulging in the presumption that their relationship to this transaction was "fair and regular" (§ 9-807, Oregon Code 1930), that their purposes were honest: *Maupin Warehouse Co. v. Fleming,* 121 Or. 531 (255 P. 606), and since a fraudulent intent not to perform a contract cannot be inferred from the mere fact of its non-performance (*Doplh v. Lennon's,* 109 Or. 336, 220 P. 161, and editor's note, 51 A. L. R. 163), we can not draw any inference from the silent record that will be helpful to the plaintiff. Moreover, whether the non-sale of the lot constituted a breach of the promise should be gauged by the conditional character of the latter. It is thus expressed in the complaint:

"Defendant further stated to plaintiff that its plan of operation was to first devote all of its time to selling the addition, and then put on a campaign to resell the same. * * * The reason that it could not resell the property sold to her immediately was because it could not put on a campaign to resell, at a higher price, the same property it was selling to her at the same time for a lower price."

The evidence failed to disclose whether the conditions had occurred. We are convinced that if the promise of resale was made by the agent as personal to him-

self and was so understood by the plaintiff, the record contains no evidence capable of supporting a finding that the promissor did not intend to fulfill it.

We are, therefore, confronted with the question whether the proof indicates that the promise was made on behalf of the principal or the agent. At the outset we remind ourselves of the well-established rule that evidence in actions of this kind, to warrant a recovery, must be clear, satisfactory, and convincing: *Herman v. East Side Logging Co.*, 135 Or. 279 (295 P. 960), (citing our earlier decisions). Since the plaintiff was the only witness whose testimony is consequential, we shall look to it to see on whose behalf the promise was made. We quote Farmer's representation, as related by the plaintiff, thus: "Miss Cameron, I will agree I will make $500 for you on this lot  *  *  *. He told me not to worry about that, he was going to do the very best for me he could, he was going to resell it for me." Her other narratives of the promise were couched in like language, generally employing a pronoun which referred aptly to the salesman but did not become the defendant, a corporation. Possibly her selection of the pronoun is not controlling, but we find in her conduct, during the twelve-month period while she maintained her payments, evidence which is quite persuasive. In that period of time she visited the defendant's offices on at least 12 different occasions for the purpose of making payments. Yet she never once mentioned the promise of a resale, although upon one of these visits she spoke to the secretary of the defendant concerning her lot and submitted her contract for an alteration of one of its clauses; but in this same period she inquired of Farmer and Baker three or four times about the prospects of reselling her lot. In the 14 months

that elapsed from the execution of the contract to the notice of rescission she saw the agent's office discontinued, all sales efforts abandoned, and was advised that Farmer had quit the state to engage in a new venture in Texas. We are of the opinion that if she believed at that time that the defendant had authorized the promise of resale she would have mentioned it upon one of her visits to its office. Next, it occurs to us that no intelligent person, who was purchasing a lot in a large subdivision where the owner was obviously endeavoring to find buyers for his many lots, would accept as binding upon him, without inquiry, the agent's promise that the owner would resell the lots for his buyers. It especially seems improbable to us that any intelligent person, like the plaintiff, would believe that such an owner would promise a buyer resales which would bring the former no profit, but which would net the buyer $500 on an investment of $493.95. Especially would it be unusual for an owner, to whom there was yet due $1,500 of unpaid purchase money, to make such a promise. The buyers might readily believe that the agent was the promissor, but we see nothing in this testimony of that convincing character required in cases of this kind to satisfy us that the plaintiff believed that the owner was the promissor. The record contains no evidence explaining how the plaintiff arrived at these unusual conclusions, which her brief declares she drew. If the plaintiff actually believed that the defendant had promised a resale it would have been permissible for her to have so testified: *Boord v. Kaylor,* 114 Or. 62 (234 P. 263). In fact she was asked: "When you say they promised, you mean Mr. Farmer? A. Mr. Farmer, representing the N. B. Clarke Company, who were agents for the

Edgemont, I took particular trouble to ask about that, and they were selling agents for the Edgemont, they told me." It seems to us that her answer indicates that she relied only on the promise of the agent. Her words "Who were agents for the Edgemont" are nothing more than a description of the agent; possibly it indicated to her mind the responsibility of the promissor and his likelihood of being able to fulfill his promise.

We conclude that the evidence discloses nothing more than a promise made by the agent for execution by himself; it does not prove the representation relied upon in the complaint. We are aware of the fact that this conclusion is different from those expressed in *Sharkey v. Burlingame Co.,* supra, and *Boyer v. Edgemont Co.,* supra. That very fact has caused us to study the testimony with care. But a very careful reading of the record has brought us to the above conclusion and we cannot escape from it by infusing into the evidence the facts of those two other cases. Each suit must be determined upon its own record.

■■ It is, of course, elementary that the mere nonperformance of a promise made, or the failure to carry out an intention expressed, in the course of negotiations, is neither fraud nor evidence of fraud: *Dolph v. Lennon's, Inc.,* 109 Or. 336 (220 P. 161). Likewise the failure of an agent to perform a promise personal to himself does not entitle the promissee to a rescission against the principal: *Elastic Paint & Mfg. Co. v. Johnson,* 127 Or. 647 (271 P. 996); *O'Neil v. Washelli Cemetery Ass'n,* 138 Wash. 566 (244 P. 990). Hence the alleged promise fails as a premise for this suit.

■ We know of nothing unlawful about the lunch and lecture system, which we have already described by

quoting plaintiff's own words, and hence its employment by Clarke does not vitiate this sale. Likewise the fact that the plaintiff was transported to this lot in Farmer's automobile is no evidence of fraud. It is, therefore, our opinion that the evidence fails to disclose any fraud.

Having taken the above view of the facts, the situation brought before us by this suit is readily distinguishable from those present in *Sharkey v. Burlingame Co.*, supra, and *Boyer v. Edgemont Investment Co.*, supra. The aforementioned principles of law applied in those suits are inappropriate to the facts present in the instant one.

There is still another reason why the plaintiff cannot prevail. We are persuaded that her conduct in continuing to make the monthly installment payments obedient to the requirements of the contract, after she had discovered, or should have known, as a person of ordinary prudence, that the defendant had no intention whatever of making a resale of her lot and had disavowed all responsibility under her alleged agreement, constituted cogent evidence that no fraud had been practiced by the defendant. Further, if we may indulge in the assumption that her signature was procured by a fraudulent promise of resale, the conduct, just mentioned, establishes a ratification of the contract by the plaintiff after the truth had been revealed to her. It is true that she claims she remained ignorant of the alleged fraud until May 1, 1929, and that, hence, her payments cannot be deemed as acts of ratification, but the evidence indicates that as early as August 1, 1928, facts began to develop which must have informed her that the defendant did not intend to resell any lots in this subdivision. As was pointed out

in *Whitney v. Bissell,* 75 Or. 28 (146 P. 141, L. R. A. 1915D, 257), notice of acts and circumstances which would put a man of ordinary prudence and intelligence upon inquiry is equivalent in the eyes of the law to knowledge of all the facts a reasonably diligent inquiry would disclose. To the same effect see *Union Central Life Insurance Co. v. Kerron,* 128 Or. 70 (264 P. 453). It is evident that this rule must be applied with caution. If the plaintiff, when she executed the contract, actually believed that the promise of resale was made on behalf of the defendant, Farmer's removal from the state, the closing of the offices of Clarke, and the cessation of all sales efforts, which occurred several months prior to the institution of this suit, must have indicated to her that the defendant did not contemplate the resale of her lot. To us, it seems that a person of ordinary intelligence, confronted by such circumstances, who was twice daily passing this subdivision, and each month visiting the offices of the defendant, would have made inquiries concerning the alleged promise of resale. Had the plaintiff made inquiry of the defendant, she would have learned that it intended to make no resales and had not authorized any promises of resales. The above being the circumstances, we believe that the two cases last cited justify us in imputing to the plaintiff information of the defendant's attitude at a time when she was still paying at the defendant's offices her monthly installments upon the contract which she now seeks to rescind.

Payment, with full knowledge of the alleged fraud, pursuant to the provisions of a contract, has been described as "evidence to be weighed by the jury tending to show that no false or fraudulent representation was made to the plaintiff's injury": *McGar v.*

*Williams,* 26 Ala. 469 (62 Am. Dec. 739). In the present instance it would seem reasonable to conclude that the plaintiff's conduct in continuing to discharge her monthly installment payments long after all sales efforts had completely ceased strongly indicated that no false representation had been made to her on behalf of the defendant. We have not overlooked the fact that she conferred on two or three occasions with the aforementioned salesmen after she had made her purchase, and received encouragement as to the possibility of a resale, but the fact remains that she continued to make her payments after all sales efforts had been abandoned, and that Farmer and Baker spoke their words as individuals and not on behalf of the defendant.

Further, her conduct in continuing to make payments, pursuant to the provisions of the contract, after she had acquired knowledge that the defendant did not intend to resell her lot, amounted to a ratification of the contract. We quote from *McCabe v. Kelleher,* 90 Or. 45 (175 P. 608):

"As against a subsequent attempt at utter rescission and recovery of what has been paid on the purchase price, payment of installments of the money agreed to be paid, with knowledge of the fraud, will amount to such a ratification as will defeat complete rescission."

In *James v. Ward,* 96 Or. 667 (190 P. 1105), this court quoted from 39 Cyc. 1432, as follows:

"Any action on the part of the purchaser treating the contract as in force when done with a knowledge of facts creating a right to rescind, amounts to a waiver of the right to rescind because of the existence of such facts."

See to the same effect: *Kruse v. Bush,* 85 Or. 394 (167 P. 308); 12 R. C. L. Fraud and Deceit, p. 413, § 159; Bigelow on The Law of Fraud, p. 434; Annotation 52 A. L. R. 1155; *Van Scherpe v. Ulberg,* 232 Mich. 699 (206 N. W. 323).

Accordingly, it is our opinion that the evidence fails to disclose that the plaintiff was induced to subscribe her signature to the contract of purchase by any false representations, and, further, that if the fraud alleged in the complaint had been practiced, her conduct in continuing to make monthly payments, after she had acquired knowledge of the fact that the defendant did not intend to resell her lot, thereby ratified the contract and rendered inappropriate the remedy of rescission.

The cause will be remanded to the circuit court with instructions to dismiss. Costs to neither party.

RAND and KELLY, JJ., concur.

BEAN, C. J., dissents.