Argued April 24; reversed May 29, 1934

CONDIT *v.* BODDING ET AL.

(33 P. (2d) 240)

*Frank C. Hanley* and *Joseph F. Hodler,* both of Portland, for appellant.

*Charles W. Robison* and *Hy Samuels,* both of Portland for respondent.

BAILEY, J. This action was started by Elvin C. Condit in October, 1929, against A. Neppach and Thomas Mannix as defendants, to recover general and punitive damages for alleged conspiracy on the part of the defendants to ruin plaintiff's business. Trial of the case was not had until May 31, 1933. In the interim both defendants died and Hazel Bodding, executrix of the estate of A. Neppach, deceased, was substituted for her decedent as defendant. No substitution was made for the late Mr. Mannix.

On the trial the matter of punitive damages was eliminated. Judgment for general damages was entered for the plaintiff and against the defendant Hazel Bodding as executrix of the estate of A. Neppach, deceased, from which judgment she appeals.

The appellant assigns as error, among other matters, the failure of the trial court to sustain her general demurrer to the complaint, and its denial of her motions for a nonsuit and for a directed verdict. Two of the grounds relied upon for a directed verdict were the insufficiency of the evidence and a former adjudication. Certain other errors are alleged, consideration of which is not necessary to this opinion.

The plaintiff summarizes his right-of recovery by referring to and quoting from a past decision of this court, as follows: "A series of wrongful acts, all aimed at a single result and contributing to the injury complained of, to wit, the destruction of one's business, credit and reputation, may be counted upon collectively as producing that result in an action on the case." Briefly stated, the plaintiff contends that the decedent defendants entered into a conspiracy to acquire for themselves plaintiff's business and that through a series of wrongful acts they had succeeded in their object, thereby causing to plaintiff great monetary loss and other injurious results of which he complains.

The complaint contains, among others, the following allegations: that in the year 1925 the plaintiff and one Homer Conser were copartners engaged in Portland in the general business of buying and selling automobiles, under the name and style of Condit & Conser; that said partnership at that time had a large and growing business, owned physical assets of a value exceeding $60,000, held leases on two pieces of business property and had an established credit at Portland banks; that in addition to his interest in the copartnership the plaintiff owned a home and household furnishings in Portland of the value of $15,000; and that said

partnership was formed in 1922 and had made a net profit of $18,187.14 in the year 1923, $20,273.85 in 1924, and during the year 1925 was making an average net profit in excess of $2,000 per month.

Paragraph II of the complaint, which states what seems to be the gravamen of plaintiff's cause of action, is as follows:

"That the month of February, 1925, the exact date being to the plaintiff unknown, A. Neppach and Thomas Mannix, the defendants above named, entered into an unlawful and fraudulent conspiracy and agreement to acquire said partnership business and the interest of the plaintiff therein, by false, fraudulent and unlawful means and to cheat and defraud the plaintiff of his interests and property in said business, and cause said business and property to be transferred to the use and benefit of defendant Neppach. That it was part and parcel of said unlawful and fraudulent conspiracy and agreement that said defendants should gain the confidence of the plaintiff and place him within their power and under their control and cause him to act under their, the said defendants', advice and direction in handling his, the plaintiff's, business affairs, and transfer the same to the defendant Neppach. That said unlawful and fraudulent conspiracy and agreement was by said defendants put into operation, pursued, and carried out, and plaintiff was by said defendants defrauded of his said interests in said business and other property and the same was taken by said defendants for the use and benefit of defendant Neppach in the way and manner and by the devices and means hereinafter set forth."

Several paragraphs of the complaint are given over to the recital of matters which plaintiff now claims are not in any way important or material to his cause of action, with the exception of certain allegations therein to the effect that the decedent Neppach represented

that he was a man of large business affairs, had all the money he needed, and would like to see plaintiff succeed; and that said decedent would interest himself in plaintiff's affairs and would make plaintiff a rich man, if the plaintiff would place himself under Neppach's guidance and follow his advice.

Plaintiff avers that in May, 1926, the corporation of Condit & Conser, Inc., was organized with a capitalization of $100,000, consisting of 1,000 shares, and the assets of the copartnership were transferred to the corporation, presumably in exchange for the capital stock of the latter; and that plaintiff and Homer Conser each owned one-half of the capital stock, with the exception of two shares held by one of their employes. It is then alleged that on or about June 1, 1926, Neppach, in furtherance of said conspiracy, represented to plaintiff that if the latter would purchase Conser's stock Neppach would furnish the money required by plaintiff for such purpose and would take the stock himself; that thereafter Neppach and plaintiff would expand the business; and that Neppach would furnish the finances therefor so that it would not be necessary to borrow from banks thereafter in order to conduct the business. Plaintiff claims that in reliance on such promises and believing them to be true he purchased the stock owned by Conser and borrowed from Neppach the money with which to pay for it. He charges that in furtherance of the conspiracy Neppach went with the plaintiff to the Citizens' Bank of Portland, where the corporation of Condit & Conser, Inc., had been accustomed to do its banking business, and there, in the presence of plaintiff, Neppach informed the officers of the bank that he would finance plaintiff's business and that the bank should make no more loans

to said corporation; that in reliance upon those representations to the bank, and others made by Neppach that he would finance the business and would purchase one-half of the capital stock of the corporation, the plaintiff consented to the cancelation of the corporation's credit at that bank.

The complaint further recites that Neppach loaned to the corporation $3,000 in July, 1926, and a similar sum in October of that year, but failed and refused to make any further loans or advances to the corporation; that during the year 1926 the corporation, by reason of its failure to obtain sufficient funds to handle used cars, was unable to show a profit; and that on December 31, 1926, the plaintiff insisted that Neppach take a transfer of the stock in the corporation formerly belonging to Conser, at which time the defendant Mannix, in furtherance of the conspiracy, advised plaintiff as plaintiff's attorney to execute and deliver to Neppach a chattel mortgage "on all the stock in trade, furniture, fixtures and equipment of said corporation to secure the advances made by said Neppach, and that said transfer of stock be delayed until a later date". Plaintiff claims that, relying on the advice of Mannix, he caused the execution of such chattel mortgage; and that later, actuated by such advice, he delivered to Neppach a mortgage from himself and his wife on certain farm lands, as further security for the loans made by Neppach.

The complaint next alleges that during the years 1926 and 1927 the plaintiff conducted the business of the corporation without any further loans from Neppach and that through lack of financing from Neppach and because of his inability to borrow money from the Citizens' Bank plaintiff's business was curtailed, but

that in the spring of 1928 the business of the corporation began to show a substantial profit; that in March, 1928, the mortgage given by plaintiff and his wife on the farm land was canceled and in lieu thereof a mortgage in the form of a deed was given on plaintiff's residential property in the city of Portland; that thereafter, in furtherance of the conspiracy, Neppach represented to plaintiff that, if the latter would deliver to him a bill of sale of plaintiff's furniture, Neppach would advance further moneys to carry on the corporation's business; that in reliance upon such promises the plaintiff executed such bill of sale; but that Neppach refused to advance any further money for plaintiff's business.

Plaintiff avers that in May, 1928, in furtherance of the alleged conspiracy, the decedent defendants employed one Harry McDonald and entered into an agreement with him by the terms of which McDonald should take over the corporation's business and manage it; that later, on May 18, McDonald took charge of the business; that on May 24 Mannix informed plaintiff that numerous creditors of the corporation were about to file an involuntary petition in bankruptcy against Condit & Conser, Inc.; and that Mannix advised plaintiff to file on behalf of the corporation a voluntary petition in bankruptcy. It is alleged that at that time the assets of the corporation were in excess of $24,000 and its liabilities did not exceed $18,000; that a voluntary petition on behalf of the corporation was filed; and that the defendants caused McDonald to be appointed trustee in bankruptcy.

Further allegations of the complaint are that the decedent defendants failed, refused and neglected to account to plaintiff for the properties received by them

in the bankruptcy proceedings; that Neppach held a deed to plaintiff's home, valued at $15,000, and had acquired plaintiff's interest in the corporation through the proceedings in bankruptcy; and that plaintiff's interest in the corporation was of the value of $50,000. Damages were asked in that sum, with the addition of $15,000 for the loss of plaintiff's home, also punitive damages.

After the death of the defendant Mannix his personal representative was not substituted as a party defendant, but Hazel Bodding, as executrix, was substituted as defendant for A. Neppach, deceased. She filed an answer setting forth the death of Neppach and her appointment as executrix. In that pleading she denied many of the material allegations of the complaint, with the exception of accounts of loans made by Neppach to the corporation.

For a further and separate answer and defense the executrix alleged that on December 20, 1929, the decedent Neppach filed in the circuit court of the state of Oregon for Multnomah county a suit against Elvin C. Condit, plaintiff here, and others, wherein the matters sought to be adjudicated in this proceeding were tried and determined adversely to the plaintiff here; and that such adjudication is a bar to plaintiff's present cause of action. The executrix attached to her answer and made a part of her defense the pleadings, findings of fact and the decree in the preceding suit.

The second further and separate answer of the executrix sets up a counter-claim in the sum of $9,151.76 with interest thereon at 6 per cent from May 10, 1930, arising out of the other suit between the parties in this proceeding.

To defendant's answers the plaintiff filed a reply denying all the allegations therein contained except such as were affirmatively admitted in his complaint.

Reverting now to the suit between the parties hereto which is set up as a bar to this action, it is well to review the matters therein adjudicated. That suit was instituted after the present action was commenced. In the amended complaint therein filed by Neppach against Condit and others the first cause of action alleged that on December 31, 1926, the defendants named in that suit executed and delivered to Neppach their note in the sum of $11,000; that the note was signed by Vern T. Brimble and his wife and endorsed by Condit & Conser, Inc., and by Elvin C. Condit individually; and that as security for that note the defendant Condit executed and delivered to Neppach a quitclaim deed on certain property in the city of Portland, which is the same property mentioned by plaintiff in the action at bar.

For a second cause of action it was therein alleged that Condit, defendant there, as security for the $11,000 note, had executed a chattel mortgage on certain personal property, consisting of furniture and household possessions of the said Condit.

In answer to the amended complaint in that action Condit alleged certain matters in abatement thereof and in an affirmative defense set up that the $11,000 note was made, executed and delivered by himself as an accommodation to Condit & Conser, Inc., as evidence of money advanced by Neppach to that corporation; that at the time the note was executed and delivered the corporation, to secure the payment thereof, had executed and delivered to Neppach a chattel mortgage on certain personal property owned by it, consisting of office furniture, supplies, tools and equipment;

that on March 16, 1928, as additional security for the loan of $11,000 Condit had delivered to Neppach a mortgage in the form of a deed to his home property in Portland; and that on or about May 21, 1928, Neppach had seized and taken possession of all the personal property mentioned in the chattel mortgage from Condit & Conser, Inc., to Neppach. Condit's answer in the foreclosure suit alleged that on May 24, 1928, the corporation, Condit & Conser, Inc., had filed a voluntary petition in bankruptcy; that thereupon Neppach had filed a claim in the bankruptcy proceedings for $11,000 on account of said note; that Neppach as principal creditor had obtained the appointment of Harry McDonald as trustee; that later McDonald was removed and Neppach was appointed as trustee; and that Neppach had failed to account for the assets received by him in the bankruptcy proceedings.

That answer further recited that Condit was at the time of the bankruptcy proceedings, and ever since has been, the owner of all the capital stock of the corporation and as such owner was entitled to all the assets over and above the liabilities in said bankruptcy proceedings upon the discharge of the corporation from bankruptcy.

For a second defense to Neppach's cause of suit Condit alleged that on March 21, 1928, he was the owner of all the capital stock of Condit & Conser, Inc.; that prior to said date Neppach had advanced to the corporation the sum of $11,000 and in order to secure the payment thereof Condit had executed and delivered to Neppach a chattel mortgage covering the furniture, fixtures and equipment owned by Condit & Conser, Inc., and had also given to Neppach a mortgage on certain real property mentioned in his first further and separate answer; and that on March 21,

1928, Neppach agreed to advance to the corporation an additional sum of $2,000 (mentioned elsewhere as $1,500), to be secured by a bill of sale of certain personal property then owned by Condit, described in plaintiff's second cause of suit, household furniture in Condit's residence.

It is then alleged that pursuant to the understanding that Neppach would advance said additional amount Condit had given to Neppach a bill of sale to the personal property last mentioned, on which Neppach was attempting to foreclose his lien in that suit; and that Neppach took the bill of sale, "but failed, neglected and refused to advance to said corporation said sum of $1,500 or any sum whatsoever". The prayer of the defendant there, Condit, was for the dismissal of Neppach's suit, for an accounting to him by Neppach of the assets of the corporation remaining after the claims against the corporation had been paid, and for other relief.

The reply put in issue the affirmative matter in the answer.

The decree of the court in Neppach's suit was for judgment in favor of the plaintiff Neppach in the sum of $12,151.76, which included attorneys' fees. The real property mortgage, on the residential property of Condit in Portland, was ordered foreclosed, as well as the chattel mortgage on Condit's household furnishings therein, and the property covered thereby ordered to be sold. In that decree the court arrived at the amount due Neppach by the following computation:

"(1) The court allows the following claims of plaintiff account first cause of suit:
(a) 12-31-26. Note and mortgage, $11,000.00
    and 7% interest, $2,562.34    Total........$13,562.36
(b) 7-27-28. Edith Stubbs mortgage ...........    684.58

310

(c) Interest paid on first mortgage by plaintiff .............................................................$ 472.50
(d) Taxes paid on first mortgage by plaintiff ............................................................. 598.24
(e) Attorneys' fees ................................................ 550.00

"(2) The court allows the following counter-claims of the defendant, Elvin C. Condit, account first cause of suit:

(f) Interest paid by defendant on $11,000.00 note ...................................................... 577.50
(g) Rentals paid by defendant ......................... 500.00
(h) *Pro rata* bankruptcy dividend on said $11,000.00 note ...................................... 1,538.00
(i) General Motors $427.28 with interest from 3-30-30 at 7%, $4.57 ......................... 431.85
(j) General Motors $2,300.05 and interest from 4-29-29 at 7%, $161.00 ...................... 2,461.05
(k) Auto Securities Co. $677.52 with interest from 7-16-29 at 7%, $37.30 ...................... .714.82

"(3) The court allows the following claims of plaintiff account second cause of suit:

(l) Powers Furniture Company ..................... 850.00
(m) Frigidaire machine .................................... 317.00
(n) Payment for parts to Durant Motor Co... 2,152.30
(o) Oakland sedan ............................................. 800.00

"(4) The court allows the following counter-claims of defendant account second cause of suit:

(p) *Pro rata* bankruptcy dividend account Oakland sedan $800.00 ............................ 112.00
(q) Promised advance account bill of sale, 3-21-28 ........................................................... 1,500.00

"(5) Total allowed claims of plaintiff, ............................................$19,986.98
"(6) Total allowed counter-claims of defendant, ........................... 7,835.22

"(7) Net amount allowed plaintiff, ..........................................$12,151.76
"(8) All other claims of plaintiff and counter-claims of defendant Elvin C. Condit are disallowed."

In his brief on appeal, counsel for plaintiff states that "had the original pleader began with the date of June 1, 1926, and had but used the broad allegation that prior to June 1, 1926, the defendants A. Neppach and Thomas Mannix had gained the confidence and the trust of the plaintiff Elvin C. Condit, he would have need go no farther, and as far as the records of this brief are concerned we are not interested in what happened prior to June 1, 1926". Nevertheless much of plaintiff's testimony and many pages of his counsel's brief are taken up with oft-repeated narrative and reiterated details of plaintiff's business and of matters which occurred prior to June 1, 1926. In order to obtain a clear understanding of the entire situation, it is advisable to refer to certain occurrences preceding that date.

Plaintiff was born in January, 1894. Up to May, 1922, he had been engaged in many activities. During the month mentioned he and Homer Conser were selling automobiles for Fields Motor Car Company in Portland and, according to plaintiff's own recital, both he and Conser were then "fired" for selling cars for other dealers than their employer. They thereupon formed a partnership and for two or three weeks were engaged in selling used cars. They were then signed as associate dealers for the Durant automobile. At the time the partnership was formed the plaintiff had saved about $3,000. Conser had about $700 worth of automobile paper, which was turned over to Condit, who took it at face value and advanced an additional $800 on behalf of Conser, making the capital of the partnership either $3,000 or $3,000 plus $700 in automobile paper.

After their first two or three weeks in business together the partners rented about six stalls in the

Tourist garage in East Portland and obtained a line of credit with the Bank of East Portland. They remained at the Tourist garage a short time only and thereafter rented for three or four months property from the Hartman estate. About December, 1922, they moved into a new building which had been especially constructed for them and which they leased for five years, making a deposit of $1,200. At the time of moving into the new building they gave up their Durant contract and obtained the agency for Star automobiles, which were then manufactured by a separate and distinct company. This agency they retained until some time in the summer of 1925, when it was given to another automobile dealer in Portland.

During the year 1923 the partnership spent about $10,000 in advertising and sold between five hundred and six hundred new cars and about three hundred used cars, doing a total business of over $700,000, on which the partners paid income tax on a profit in excess of $18,000. In 1924 they did a gross business of over $800,000 and paid income tax on profits of over $20,000. In 1925 their business grossed over $1,250,000, and they paid income tax on profits exceeding $24,000. During the period that Condit & Conser had the agency for the Star automobile, $20,000 to $25,000 annually was spent for advertising in Portland by the partnership and the manufacturer.

From the time the partnership was formed, its banking was done with the Bank of East Portland, until about the first of 1925, when the Citizens' Bank of East Portland solicited its business and offered the partners unlimited credit on their automobile paper. At one time they had an open account with the Bank of East Portland of some $22,000, and upon changing

to the Citizens' Bank had an open account of $10,000 with the latter institution. On their unlimited credit on automobile paper the Citizens' Bank would loan up to 75 or 80 per cent of the factory price on new automobiles, and the partnership made up the difference in cost and paid the freight charges.

In December, 1925, the plaintiff bought a residence in Portland for $9,500, on which were a first mortgage of $4,500 and a second mortgage of about $900. The furniture therein, according to his testimony, was worth at least $6,000. However, most of it was being purchased on the instalment plan, and Neppach later paid thereon $1,167.

In the fall of 1924 Neppach called upon the plaintiff in quest of the partnership's automobile warehousing business. At that time Neppach had a building covering an entire block, in which he stored automobiles for dealers. It had been found by the partnership in the spring of each year that it was necessary to store from one hundred fifty to two hundred automobiles, and at that time arrangements were in effect with another warehouse company for such storage. Neppach, in order to get this business, said that he would probably be able to finance some of the partnership dealings when the banks would not do it. He was advised by plaintiff that the partnership did not desire to make a change. In about a week or two he returned, and obtained some, if not all, of the partnership's storage business, which he kept until six months or a year later, when plaintiff obtained a purchaser for the warehouse. During all the transactions with Neppach through the warehouse business, all was honorable and there was nothing for plaintiff to complain about, according to his own story.

During 1925 Neppach advanced some money to the partnership on cars stored in his warehouse, but made no loans. In 1924 and 1925 Neppach showed plaintiff and his relatives numerous attentions and courtesies, such as providing them with free tickets to the Ice Hippodrome, which he owned. He also spent many evenings at plaintiff's home.

In April or May, 1925, while plaintiff was involved in litigation, Neppach introduced him to the defendant Mannix, who at that time was Neppach's personal attorney. That was the first contact that plaintiff had with Mr. Mannix. From that time the latter acted in some matters as plaintiff's attorney, although plaintiff consulted at least two other lawyers about some of his business.

In January, 1926, the partnership of Condit & Conser was incorporated under the name of Condit & Conser, Inc., and continued the business formerly conducted by the partnership. Before the partnership had been formed and while working for Fields Motor Car Company, according to plaintiff's narrative, he sold twice as many cars as Conser and was one of the few people who could get along with Conser. While the partnership existed, Condit was its manager and directing head. About the time the partnership began to be successful financially, plaintiff had difficulty getting Conser to pay interest on the $800 which Condit had advanced for him.

After the incorporation and shortly before June 1, 1926, Neppach told Condit that he did not like his associate, Conser, and asked Condit why he did not buy the latter's stock in the corporation. Condit answered that he would like to do so but did not have the necessary funds for that purpose. Neppach said that he would advance to Condit the required amount.

During the early part of 1926 and up to the time that Conser sold his stock the corporation had a great many outstanding bills and creditors were continually making demands for payment.

Negotiations were entered into through which Conser agreed to sell his stock in the corporation for $5,000, and Neppach gave to Condit a check for that amount. The check was dated June 1, 1926, and was deposited by Condit in the Citizens' Bank. On May 29, 1926, Condit and Conser entered into a contract by the terms of which Condit agreed to give Conser a bill of sale of certain used automobiles, 19 in number, as payment in full for all the right, title and interest of Conser in Condit & Conser, Inc. At that time the corporation owed the Citizens' Bank the sum of $5,000, which indebtedness, together with other liabilities of the corporation, Condit agreed to assume and pay. Conser was also to receive $500 for back salary and was to pay the balance of a contract for the purchase of an automobile which he was then using. According to Condit's testimony, ''Conser was in a position where he couldn't carry on any more''. He had overdrawn his account some $1,200 or $1,500.

On June 2, 1926, a bill of sale was executed by Condit & Conser, Inc., and delivered to Conser, for the used cars mentioned in the contract hereinbefore referred to, which bill of sale stated the consideration for used cars as $4,000. Upon Conser's removal of the used cars covered by the bill of sale the corporation was left with very few used automobiles, the aggregate value of which did not exceed $2,500.

Plaintiff testified that he deposited the Neppach check for $5,000 and drew his own check for an equal amount in favor of Conser, who endorsed it back to

the corporation, and that in lieu of the $5,000, used automobiles, the same that were listed in the bill of sale, of the value of $15,000, according to plaintiff, were turned over to Conser for his half interest in the corporation. According to respondent's brief, Conser with the $5,000 check given to him by Condit for his stock in the corporation purchased the used cars mentioned. Conser himself denies this and states that no money whatever was paid to him and that the used cars which were delivered to him were of the value of $4,000 and no more, as stated in the bill of sale. There is, as far as we have been able to discover, no evidence whatever that Neppach was in any way consulted by Condit relative to the sale of the used automobiles to Conser, although the respondent in his brief says, without referring to the transcript of testimony, that Neppach consented to and advised the sale of these cars for the sum of $5,000; and one of the wrongs charged to Neppach in this action is the depleting of the physical assets of the corporation by the sale of these used cars, allegedly worth $15,000, for only $5,000.

After the sale of his stock, Conser ceased to be connected with the corporation in any way, and the business was carried on under the management of Condit.

On June 1, 1926, the corporation had no account and was doing no business with the Bank of East Portland. Following the transfer of its account to the Citizens' Bank no new business, apparently, was done with its former banking connection. After Conser's stock had been sold, during a visit of Condit to the Citizens' Bank the president of that institution asked to meet Condit's new "partner", and in compliance with that request Condit went with Neppach to the bank and introduced him to the president or vice-president thereof.

During the conversation Neppach is alleged to have said: "I am going to be the bank; we don't need you fellows any more. I am going to be the bank, I am going to furnish all the money." Thereupon Condit stated to the officer of the bank with whom they were talking that they would keep the corporation's deposit there as usual and would probably use the bank part of the time. At that time the bank was financing some of the retail paper for the corporation and the corporation was indebted to it $5,000, on an unsecured loan evidenced by a note. After this occurrence the bank did finance some of the corporation's retail sales, or customers' paper, but apparently no new loans were made by it to the corporation.

At least $3,000 of the $5,000 check given by Neppach on June 1 was used in payment of part of the indebtedness which the corporation then owed the Citizens' Bank. It required some further time for the corporation to be able to pay the balance of its indebtedness to the bank.

It is the plaintiff's contention that he was buying Conser's stock for Neppach and that the only inducement which caused him to purchase the stock was Neppach's representation that he would finance the corporation. Neppach, according to Condit, informed him that he, Neppach, had recently sold his half interest in the Nicolai-Neppach Company for $500,000, that $250,000 was still owing him thereon, and that he, Neppach, could procure from a certain bank at any time he desired a loan up to $90,000.

On August 17, 1926, Neppach gave to plaintiff a check for $3,000, and on December 31 of the same year he gave another check for a like amount to the corporation. On the latter date Neppach was given

a note for $11,000 with interest payable quarterly at the rate of 7 per cent per annum, signed by Vern T. Brimble and his wife and endorsed by the corporation and by Condit individually. At the same time the corporation delivered to Neppach a chattel mortgage on the supplies and equipment in its place of business, and the other mortgages above mentioned were also at that time, or subsequently, delivered to Neppach.

In July, 1925, the partnership made a profit of $10,000 through the sale of Moon, Hudson and Essex automobiles. The partners were then closing out their line of Star cars. When the Moon cars were offered for delivery the partnership refused to accept them because of their being obsolete, but finally took them at the price of $600 each and sold them for $1,300 each.

During 1926 and 1927 the corporation lost money, although in certain months during those years a profit was shown. During that time an attempt was made to sell Hudson and Essex cars, which, although apparently successful for a while, resulted in giving up the agency after a short time, as, according to Condit's assertion, the cars "did not stand up". An attempt was also made by the corporation to sell Oakland and Pontiac cars, but was abandoned in the fall of 1926. The contract for Moon cars was given up about August, 1927, after selling them from August, 1924, because, so plaintiff said, the manufacturer put out new models which the corporation did not like.

About this time the Durant and Star manufacturers consolidated and a new Durant was placed on the market. The Portland agency therefor was acquired by Condit & Conser, Inc. The consolidated factory, however, was unable to furnish automobiles immediately upon order and during the latter part of

1927 and the early part of 1928 Condit & Conser, Inc., could not obtain deliveries. However, in March, April and May, 1928, a few cars were delivered to the corporation.

After the corporation obtained the franchise for the new Durant car, late in 1927, Neppach financed the purchase from the factory of about 30 automobiles at an average price of $700 each. He also financed the retail contracts for about 15 to 20 new Durant cars.

The corporation began to make a little profit during the month of March, 1928, after the factory started to make deliveries, although its monthly expenses were around $3,000.

About May 15, 1928, one Harry McDonald appeared at the office of the corporation with Neppach, who introduced him as "the new boss". Under date of May 15, an inventory of the stock on hand was made by McDonald, totaling $6,722.21, which inventory was approved by Condit. There was also a list made of the office furnishings and shop equipment, and it was likewise approved by Condit.

At that time one Trueblood was the local representative of the Durant Motor Company and a question arose concerning the transfer of the franchise from the corporation to McDonald. After an interview with Condit, Trueblood notified the home office of the Durant Motor Company by wire of the proposed change, and in answer thereto received, on May 16, the following telegram:

"Condit balance thirty seven hundred twenty nine dollars ninety one cents. Stop. Satisfactory to make deal with McDonald to take over business and arrange settlement with creditors retaining Condit as sales manager provided we are paid in full in cash for Condit balance".

This condition was agreed to by McDonald and apparently was not protested by Condit, who remained in the management of the office for several days after McDonald came to take charge.

When McDonald arrived on the scene he suggested purchasing Condit's interest in the business. McDonald also stated that he was going to advance enough funds to get the corporation on its feet. Condit, however, became somewhat disgusted when he learned that McDonald was using his hat as a depository for currency in his possession.

About May 20, Condit left for eastern Oregon in the interest of a mining project which he had there, and was gone four or five days. On his return he found that "the creditors were all up in the air".

Before May 24, 1928, action had been started against the corporation by two of its salesmen, each demanding between $500 and $600 for commissions or salary in arrears, and the property of the corporation had been attached.

On or about May 24, Neppach and Mannix told Condit that creditors of the corporation were preparing to file involuntary proceedings in bankruptcy against the corporation, and advised him that it would be preferable for the corporation to file a voluntary petition in bankruptcy, in order to have something to say about the appointment of the trustees. Thereupon a voluntary petition in bankruptcy was prepared by an attorney associated with Mannix and sworn to by Condit as president of the corporation, under date of May 24, 1928, and filed on the following day. In that petition were listed debts amounting to $21,288.28, of which amount $11,000 was the note to Neppach, listed as a secured claim. The amount due Durant Motor

Company was listed at $3,727.91. The amount due on open accounts was shown as $1,369.33. Condit testified that when he noticed in the newspapers the next day that no assets were listed in the petition he immediately consulted two other attorneys, one a specialist in bankruptcy, and an inventory of the assets was prepared by one of the attorneys, signed by Condit and filed on May 29. That inventory showed bills receivable, promissory notes and securities due amounting to $3,857.55; stock in trade, $7,589.71; and "machinery, tools, furniture, etc., under mortgage", $12,848.41; or a total of $24,295.67.

Condit, according to his testimony, was advised by Mannix and Neppach that the bankruptcy was temporary, that the creditors would be paid off, and that the company would soon resume business. After the bankruptcy papers were filed Condit remained with the concern for a day or two. During that time McDonald suggested to him that if he, Condit, would "work along with" McDonald, the latter would show him "how to clean this fellow Neppach up". Condit advised Neppach of the affair, and when Neppach took McDonald to task Condit left. McDonald was appointed trustee in bankruptcy, and about three months later was removed and Neppach appointed. After the bankruptcy proceedings were under way Neppach bought up most of the claims against the bankrupt at 30 cents on the dollar.

The total amount received from the assets of the bankrupt corporation was $3,921.31, "plus an additional sum of $600 which represents the proceeds of a reserve account receivable" due the bankrupt estate from Automobile Securities Company. After paying the costs and expenses of the bankruptcy proceedings

and the preferred claims, there remained $2,335.51 to be applied on the general creditors' claims. Listed among these last-mentioned claims were Neppach's note for $11,000 and a claim which he had against the corporation for $800. Before Neppach was appointed trustee he had purchased most of the other claims.

At the time the petition in bankruptcy was filed, Condit was drawing a salary of $500 a month from the corporation. His first salary out of the business, early in his partnership with Conser, was $150 a month. When the partnership business began to improve, each partner drew out $500 a month. That amount continued to be the monthly salary of both Condit and Conser during the remainder of the partnership and during their association together in the corporation. While the partnership existed, in computing net profits of Condit & Conser, salaries of the partners were included.

Neppach was approximately 68 years of age when he first met Condit. For many years he had been a successful business man, connected with the Nicolai-Neppach Company. No evidence was introduced showing that the representations made by him as to his interest in that concern and his financial worth were not correct.

Although during the existence of the partnership and the first year the corporation was in business Condit devoted his entire time to his automobile business, during the years 1927 and 1928 about one-third of his time was given over to his mining venture in eastern Oregon. He attempted to sell stock in his mining corporation to Neppach, but the latter did not buy.

The evidence as hereinbefore recited is taken almost exclusively from Condit's testimony. In such

of the above statement as has been based on other evidence care has been taken not to refer to matters which are in dispute. Plaintiff's claim to a right of recovery is based largely on the premise that Neppach purchased and became the owner of one-half the capital stock of Condit & Conser, Inc., on Neppach's alleged agreement with Condit at the time of such purchase and as consideration therefor that Neppach would provide the corporation with necessary financial assistance up to $100,000, and on the failure of Neppach to carry out this alleged agreement.

■ All through his testimony plaintiff states and reiterates that Neppach in fact purchased the stock in the corporation formerly owned by Conser and that the $5,000 check given by Neppach on June 1, 1926, was in payment for this stock. In the suit of *Neppach v. Condit et al.*, instituted after the commencement of this action, decree in which was entered on May 10, 1930, it was determined that said $5,000 was a part of the $11,000 note sued upon and was loaned by Neppach to the corporation. That fact was alleged in both the complaint and Condit's affirmative defense therein, Condit claiming that he individually had signed the note as an accommodation to the corporation. Condit further alleged at least two distinct times in that answer that he was the owner of the entire capital stock of Condit & Conser, Inc., and as such owner was entitled to an accounting from Neppach of certain assets of the corporation which Neppach had received as trustee of that bankrupt concern. We therefore have a former adjudication which has not been set aside, reversed or appealed, to the effect that the $5,000 represented by Neppach's check of June 1, 1926, was not given in exchange for any capital stock, but was a loan to the corporation.

Many of the other matters now relied upon as a basis for recovery by plaintiff were also litigated and determined in the suit of *Neppach v. Condit et al.* Reference need only be made in this respect to the itemized statement of the decree hereinbefore quoted.

We then find that Neppach in the role of a creditor of Condit & Conser, Inc., not only advanced the $5,000 mentioned but $3,000 additional without at first any security. When he came to advance a further $3,000 he demanded and without objection was given the security hereinbefore stated.

When we have eliminated from consideration plaintiff's premise that Neppach purchased for $5,000 Conser's stock in the corporation, we have virtually removed the entire foundation upon which plaintiff's case is built.

■ It must be remembered that Condit claims to have taken Neppach to the Citizens' Bank as his "partner". It was in the capacity of partner or associate in the corporation that Neppach was alleged to have declared to the officer of the bank that he, Neppach, would in the future act as banker for the corporation. Although Condit testified that Neppach by stating that he was to act as banker cut off all future credit of the corporation with the Citizens' Bank, nevertheless the corporation continued to keep a deposit in the bank and obtained further financing of retail contracts through the bank; and at no time was it denied credit. When confronted with the fact that he had not applied to the Citizens' or other banks for credit, Condit asserted that Neppach had put Condit & Conser, Inc., in such a condition that the corporation had nothing to make a showing upon which credit could be obtained.

■ The alleged agreement between Condit and Neppach whereby the latter was to finance the corporation, that is, the agreement on behalf of Condit to purchase for Neppach, Conser's stock in the corporation, in exchange for which Neppach was to do the financing, never was consummated, for the reason that Condit did not buy for Neppach the stock mentioned. The decree in the suit of *Neppach v. Condit et al.* definitely settled that question adversely to Condit's present contention. As this is the state of facts, there was no consideration for the alleged agreement binding Neppach to finance the corporation or preventing him from refusing to do so.

The history of Condit & Conser, as a partnership and later as a corporation, is not unlike that of many other business concerns. For a time the business flourished, while devoted to the sale of a popular-priced automobile. When the agency for that was lost, first one and then another make of automobile was taken on, in unprofitable experiment. It is inconceivable that, if the prospects of the corporation had been as good as represented by Condit, Conser would have been willing to sell his half interest therein for the sum of $5,000 or, as the written evidence shows, for $4,000 worth of used cars.

Plaintiff, however, denies that the used cars were worth only that sum, and asserts that their value was in excess of $15,000. The list of these cars, 19 in number, shows that 14 were touring models, which at that time were rapidly being displaced by closed cars. Five were Moon cars, four of them touring models, and during the previous year the partnership had been able to buy new cars of that make at $600 each. The list contained two Durant cars of obsolete model; two

Star touring cars; one Ford coupe; an obsolete Mitchell touring car; and Flint, Velie, Paige and Franklin touring cars. A wholesale price of $15,000 for the lot would necessitate the retail sale of these used cars at close to $1,000 each in order not to result in a loss.

The entire management of the business of Condit & Conser, Inc., after June 1, 1926, until about May 15, 1928, when McDonald became connected with the corporation's affairs, appears to have been under the direction of Condit himself. Condit's complaint is not that Neppach during that period interfered with the management of the business or attempted to direct its policies, beyond refusing to furnish money to the extent deemed requisite by Condit.

When McDonald became connected with the operation of the business he discussed purchasing Condit's interest, a matter which Condit appears to have considered seriously. At that time the indebtedness of Condit & Conser, Inc., to Neppach was long past due, and Neppach was entitled to the possession of the personal property covered by his chattel mortgage. Whether or not McDonald was placed in charge to care for Neppach's interests the record does not make clear. The corporation was then indebted to the Durant Motor Company to the extent of $3,729.91, and when the Durant agency was transferred from the corporation to McDonald the latter paid to the factory $2,152.30 as the inventoried price of parts on hand and gave a note for $1,577.61 due in 90 days, for the balance. He also paid the balance due for cars in stock.

■ Plaintiff's case in the circuit court seems to have been based upon alleged misrepresentations and fraud committed by Neppach and Mannix. Now he abandons

that theory and says that this is purely an action on the case. He relies chiefly upon the decision of this court in *Cash v. Garrison,* 81 Or. 135 (158 P. 521), from which was taken the quotation at the beginning of this opinion. In that case the facts were that the defendants were guilty of conversion of certain property, had breached an agreement with the plaintiff and had, by misrepresentation and fraud, acquired possession of some of plaintiff's property. Those were the wrongs to which this court in that case referred, each of which was sufficient as the basis of a cause of action. Instead of bringing separate actions, one for conversion, another for fraud and misrepresentation, and a third *ex contractu,* the plaintiff was permitted to bring an action on the case for the combined actionable wrongs of the defendants.

In the case at bar the plaintiff had no cause of action *ex contractu* against the defendant for failure to carry out the alleged contract to provide future funds. He had no cause of action in trover for the conversion of any of his property, except the alleged claim that Neppach as trustee of the bankrupt corporation had not accounted to Condit, as the sole owner of the capital stock of the corporation, for the assets remaining after the creditors' claims had been paid, which matter was litigated and determined in the suit of *Neppach v. Condit et al.*

██ All the representations by Neppach claimed to have been false and fraudulent were made as to what he would do in the future, and such promises could not form the basis of a charge of fraud and misrepresentation: 27 C. J. 32, § 149. There is no evidence that Neppach's financial condition was not such as he represented it to be, and no showing that he did not intend to do as he promised. At the time he is alleged to have

agreed to act as banker for the corporation that concern had a credit of only $10,000. Neppach did better than the bank was doing, by loaning the company $11,000. He also financed much of the wholesale and retail paper of the corporation. The basis for such alleged promises on the part of Neppach was, however, as hereinbefore pointed out, not proved. Neppach never became a stockholder in the corporation.

Plaintiff cites, in connection with his contention that the facts in the present instance are sufficient to support an action on the case, *Kaller v. Spady,* 144 Or. 206 (10 P. (2d) 1119, 24 P. (2d) 351), and *Budd v. Multnomah Street Railway Company,* 15 Or. 404 (15 P. 654). These cases, however, are based on facts materially different from those in the case at bar and a review of them here would serve no useful purpose.

"In an action on the case in the nature of a conspiracy, the grounds, or gravamen of the action whether single or several, must be set out with the same certainty as in an action against a single defendant for the same character of action, whether it be libel, slander, assault and battery, malicious prosecution, or false imprisonment; for the judgment may be against a single defendant without proof of the conspiracy, although it can not be entered against joint defendants without such proof."—12 C. J. 629, § 214.

In order to constitute the basis for an action on the case there must be some actionable wrong committed by defendant. The wrong of which plaintiff complains here other than defendant's failure to carry out his promises to give financial aid is that of alleged fraudulent representation by the defendant.

"To constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew

it was false, or made it recklessly without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with reasonable certainty, and all of them must be found to exist. The absence of any one of them is fatal to recovery: 20 Cyc. 13. Where a party complains of false representations, whereby he was caused to suffer damage in a transaction with some third person, it devolves upon him to show expressly that the alleged wrongdoer intended, or, what is the same thing, that he may reasonably be supposed under the circumstances to have intended, that the plaintiff should act upon the misrepresentations; and it is not enough to prove that the same were made with knowledge of their falsity: 1 Bigelow, Fraud, p. 536.''—Wheelwright v. Vanderbilt, 69 Or. 326 (138 P. 857).

See, also, in this connection, *Blair v. McCool,* 136 Or. 139 (295 P. 950, 298 P. 244), and *Brown v. Siemens,* 117 Or. 583 (245 P. 510).

Again we repeat that the evidence in the case at bar fails to prove that the representations made by Neppach as to his future financial assistance were false and fraudulent when made. Even had he not intended, when he made these promises, to fulfill them, there was no legal obligation on his part to do as he promised. Furthermore, the evidence fails to show that the plaintiff suffered any injury due to his reliance upon defendant's representations.

The motion for a directed verdict in defendant's favor should have been granted by the circuit court. The judgment appealed from is reversed and the cause remanded with directions to enter judgment in favor of defendant for her costs and disbursements.

RAND, C. J., and KELLY, J., not sitting.