Argued November 29, affirmed December 19, 1950

# CONZELMANN AND CONZELMANN *v.* NORTH-WEST POULTRY & DAIRY PRODUCTS CO. AND NORTON
# SPATH, Administratrix, *v.* NORTHWEST POULTRY & DAIRY PRODUCTS CO. AND NORTON

225 P. (2d) 757

*Arthur S. Vosburg* argued the cause for appellants. On the briefs were Flegel, Vosburg, Joss & Hedlund, of Portland.

*Robert M. Kerr* and *Stuart W. Hill* argued the cause for respondents. On the brief were Kerr & Hill, of Portland.

Before LUSK, Chief Justice, and BRAND, LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

The above entitled causes are actions for deceit. In one, Erich F. Conzelmann and Elizabeth Conzelmann, doing business as Conzelmann and Conzelmann, are plaintiffs, and Northwest Poultry & Dairy Products Co., a corporation, and C. W. Norton are defend-

ants; in the other, Martha E. Spath, administratrix of the estate of Leonard W. Spath, and Martha E. Spath are plaintiffs, and the cause of action alleged is against the same defendants.

It is stated in appellants' opening brief that the two actions were consolidated for trial and also for hearing on appeal, because "both cases arose out of substantially similar facts, and the determination in one case will be decisive of the other." We shall, therefore, treat both cases in this one opinion.

In the lower court, a motion for a judgment of involuntary nonsuit was sustained in each case, and the actions were dismissed. From these judgments the plaintiffs appeal.

■ In testing the correctness of the lower court's rulings it is necessary that this court consider the testimony offered on the trial in the light most favorable to the plaintiffs. Several days were consumed on the trial, resulting in a mass of testimony, some relevant and some irrelevant to the real issues involved. We shall confine ourselves to an outline of the material facts.

Plaintiffs are turkey growers, having been engaged in that business for a number of years. Their farms are located in Clackamas county, not far from Oregon City. Mrs. Conzelmann and Mrs. Spath are sisters, and the two families live within a mile of each other. In 1945, the Conzelmanns and Spaths operated as partners, but in all other years, they carried on separately.

Defendant Northwest Poultry & Dairy Products Co., hereafter referred to as "Northwest Poultry," is an Oregon corporation, chiefly engaged in buying and selling turkeys and in processing them for the growers. It has several plants in Oregon, including plants at Port-

land and Salem, and is the largest handler of turkeys in this state. It has no storage facilities in its Portland plant, and after purchasing turkeys, it stores them with the Northwestern Ice and Cold Storage Co. in Portland. Defendant C. W. Norton, hereafter referred to as "Norton," is the president, general manager and in complete control of the operations of Northwest Poultry, and, in addition, owns approximately one-third of the capital stock of the corporation.

For several years continuously, immediately prior to the events leading up to the instant litigation, plaintiffs were customers of the Northwest Poultry; that is to say, each year Northwest Poultry had handled their turkeys either as purchaser or processor.

Turkeys are marketed by the growers selling them to produce houses such as Northwest Poultry, and the produce house then resells to retailers and other large buyers for its own account. The grower ordinarily has two choices in the way of marketing his turkeys. The most common practice is for him to sell to a produce house when the turkeys are ready for killing. If this method is adopted, the produce house provides the means to transport the turkeys from farm to processing plant and then processes the same, which means that the turkeys are killed, plucked, their craws washed out, and graded. The viscera are not removed. After grading is completed, the produce house pays the grower so much per pound for the turkeys, according to grade, and then places the turkeys in storage for its own account. The turkeys purchased from different growers are commingled. The amount paid is net to the grower, the produce house absorbing the costs of transportation and processing. Turkeys are customarily graded A, B, C, culls, and no-grade. The other alterna-

tive the grower has in marketing his turkeys is to have them packed in standard boxes with so many to each box placed in cold storage for his account, after the same have been processed and grades determined. The number and grade of the turkeys in each box are written on the box, as well as the name of the produce house grading the same. It is the usual practice to store only A, B, and C grades and to immediately sell the culls and no-grades to the produce house at an agreed price. No charge is made by the produce house for processing culls and no-grades. On the turkeys placed in storage, the produce house makes a charge for collecting, transporting, processing, and grading. In 1947, this charge of the Northwest Poultry was $3.75 per cwt.

In grading turkeys, different standards are followed. Each produce house grades according to its own specifications. On the other hand, the United States Department of Agriculture has adopted specifications for grading, this being known as the U. S. Grade. The grade of the produce house is known as a commercial grade. The Northwest Poultry set its own specifications and graded accordingly. These specifications for different grades are much less stringent than those established by the United States Department of Agriculture.

As turkeys are delivered to Northwest Poultry and processed, grade sheets are made out showing the number of birds delivered, the weight, and the grade, and copies of these grade sheets are delivered to the grower. When turkeys are placed in storage for the account of the grower, a warehouse receipt is issued him showing number, weight, and the grade of those stored.

The turkeys marketed are from poults purchased by the grower usually when they are a day old. These poults are purchased from different sellers, depending upon what size finished turkeys are desired. Some sellers handle poults producing lightweight turkeys, while others sell poults producing those that are heavier. The choice of what type and strain of turkey a grower wishes to raise rests with him.

In 1947, the Conzelmanns purchased poults which would produce a lightweight turkey; those purchased by the Spaths produced a little heavier bird. The turkey poults purchased by both parties were approximately one-half toms and one-half hens. Hen turkeys mature earlier than the toms, and the Spath hens were received by Northwest Poultry on September 2 and 3, 1947, and those of the Conzelmanns on September 4 and 5.

Acting pursuant to directions of plaintiffs, Northwest Poultry processed these hen turkeys and then caused them to be placed in storage for the separate accounts of the plaintiffs. A, B, and C grades were stored, the culls and no-grades being purchased by Northwest Poultry, as was the custom. These hen turkeys were sold by the plaintiffs to Northwest Poultry in December, 1947, the Spath lot for 52½ cents per pound for the A grade, and the Conzelmann lot for 53 cents per pound for the A grade. This was ½ cent bonus on the Conzelmann hens. There is usually a three cent difference in market price between the A and B grades and the B and C grades.

When turkeys are picked up and delivered to the plant of Northwest Poultry, they are processed immediately. The Northwest Poultry is equipped to handle approximately 2,000 turkeys a day at its Port-

land plant. If the processed turkeys are to be immediately sold, they are sent to the eviscerating room where the viscera are removed; otherwise, to the cold storage plant.

Before any of the tom turkeys of plaintiffs were picked up by Northwest Poultry in September, 1947, the plaintiffs advised the defendants that they desired to have the tom turkeys handled in the same manner the hen turkeys had been handled; that is, placed in storage to their several accounts. The defendants deny that such instructions were given, but for the purposes of this case we must adopt the plaintiffs' version. At the time these tom turkeys were picked up, and for several months thereafter, there was a low market price. (At the time of delivery the price was 40 cents per pound for A grade.) Plaintiffs desired to hold their turkeys in the hopes that market conditions would improve.

Northwest Poultry picked up the Spath tom turkeys on September 22 and 23, and on September 26, commenced picking up the Conzelmann tom turkeys. By the 29th only two-thirds of the Conzelmann birds had been taken. The delay in picking up these turkeys caused the Conzelmanns considerable worry, and they complained to defendants. It was not until October 7 that the remaining Conzelmann turkeys were collected and taken to the Salem plant of Northwest Poultry for processing.

Instead of storing these original turkeys for the accounts of the plaintiffs, Northwest Poultry had them immediately eviscerated and used to fill an order. The Spaths discovered this on or about September 24, and the Conzelmanns, on or about September 29. When they discovered their turkeys had been sold, plaintiffs

complained to defendant Norton. At that time, the turkeys had been commingled with turkeys purchased from other growers. Norton then agreed, first with the Spaths, and then with the Conzelmanns that defendants would replace the original turkeys with other turkeys of like number, weight, and grade. To this the plaintiffs assented. We quote briefly from the testimony of Erich Conzelmann as follows:

"Q. When Mr. Norton told you that—you say he told you that they would store pound for pound, grade for grade, you were satisfied with that, weren't you?

"A. Yes sir, it was perfectly satisfactory. We had our faith in him.

"Q. When he told you that—you say he told you that they had sent them to the viscerating room here, late in September, the birds that they had received from you?

"A. Yes.

"Q. When he told you that, you agreed that it would be all right if he would put into storage other birds?

"A. That is right.

"Q. And it was settled on that basis?

"A. That is what it was."

After the last of the Conzelmann turkeys had been taken to Salem, there remained 35 birds on the farm. Conzelmann procured coops at Northwest Poultry and personally delivered these turkeys to the Portland plant. For some reason no record was made of this delivery. However, when brought to the attention of defendants, they took Conzelmann's word for the number and allowed him the average weight of the other turkeys delivered and gave them all an A grade.

Plaintiffs had been financed in the growing of their

turkeys by Willamette Credit Bureau, of Salem. This firm opposed the plan to store the turkeys, and it became necessary for plaintiffs to refinance their operations. With the active assistance of defendant Norton, they were able to secure new loans from the First National Bank, Oregon City Branch. This refinancing made it necessary to then secure warehouse receipts for their turkeys in storage to deposit as security for the loans. Up to this time—about October 20—Northwest Poultry had not performed its agreement to place in storage for the separate accounts of plaintiffs turkeys of equal number, weight, and grade of those originally delivered. This delay was explained by Norton as resulting from a desire on the part of defendants to save plaintiffs the storage charges. But the requirements of the bank with respect to security rendered it necessary at that time to place to the separate accounts of plaintiffs the turkeys in question, and that was done, and warehouse receipts issued to plaintiffs accordingly.

Due to the fact that in storing turkeys a certain number only can be placed in each box, each box containing birds of the same grade, there were certain turkeys of each grade (short of the number in each grade to make a full box) which were not placed in storage, thus resulting in a shortage in total pounds. But no attempt was made to conceal these shortages, and plaintiffs were advised that Northwest Poultry would pay for the same when the turkeys were sold. This arrangement also was agreeable to plaintiffs. In the lot stored for the Conzelmanns, all the original turkeys processed at Salem were included.

Some contention is made by plaintiffs respecting the charges made against them by Northwest Poultry

for processing their turkeys, it being claimed that such charges were in excess of the amounts actually due, according to the weight of turkeys originally delivered; also, with respect to the Spath turkeys, it is claimed that these charges show there was a substantially greater amount of poundage in the turkeys originally delivered than in the total poundage of those placed in storage. From a careful review of the entire record, it is clearly made to appear that these overcharges resulted from bookkeeping errors, and not from any intent or purpose on the part of defendants to overreach or defraud plaintiffs.

From September, 1947, until February or March, 1948, the market for tom turkeys of the size and quality of plaintiffs' continued poor. Market reports were regularly issued, showing from time to time the condition of the market. These reports were available to all engaged in the business. Norton was recognized in the trade as an authority upon market conditions and was consulted from time to time by turkey growers, banks, and others interested. From November on, plaintiffs frequently consulted Norton respecting the marketing of their turkeys and were advised by him to hold for a rising market, as he was certain the market price would rise. And subsequent events proved the accuracy of his predictions, because late in February and in March and then on continuously for some period of time, the market price showed substantial increases.

At all times from September, 1947, on, Norton stood ready to purchase plaintiffs' turkeys at any time they wished to sell at the then market price and to pay them according to the number, weight, and grade of the turkeys originally delivered, rather than the number, weight, and grade of those placed in storage to replace

the original birds. As to this arrangement, Erich Con-
zelmann testified:

"Q. You had agreed with him, hadn't you, or
rather, he had agreed with you, that whenever you
wanted to sell those birds, he would pay the then
market price, is that right?

"A. I believe we had that agreement, that he
would.

"Q. That was your understanding: Whenever
you wanted to sell those birds, Northwest would pay
you the market price?

"A. That is right.

"Q. At the time that you decided that you
wanted to sell?

"A. That is right.

"Q. And that was to be on the basis of the
delivered weights and the delivered grades?

"A. That is right.

"Q. That was your definite agreement with
Northwest:

"A. That is right."

Mrs. Spath testified to this standing offer on the
part of Norton, and both she and Mr. Conzelmann testi-
fied that at no time did Norton urge them to sell to
Northwest Poultry or anyone else.

In early February, 1948, an examination of the
turkeys in storage was made by E. L. Martindale of
the Oregon Poultry & Dairy Products Co., a competitor
of Northwest Poultry, and also by Thomas E. Fallihee
of the United States Department of Agriculture, whose
official title is "Marketing Specialist, State of Ore-
gon." Plaintiffs and one "Ulmer," a brother of Mrs.
Conzelmann and Mrs. Spath, and employed by the
Conzelmanns, also examined the birds in storage dur-
ing this period of time. According to U. S. Grade,

Fallihee found that approximately 65% of the A grade turkeys in the Conzelmann lot were in fact B's, and approximately 17% of the B's were C's; that 35% of the A grade turkeys in the Spath lot were B's, and approximately 6% of the B's were C's. According to Martindale, there were some B grades in boxes marked A grade and some C grades in boxes marked B. He also testified that as of that time, a substantial portion of the Conzelmann turkeys were below the grades fixed by Northwest Poultry on those originally delivered. All testified that the Conzelmann turkeys in particular lacked proper finish and in some cases showed freezer burn. Lack of proper finish means a lack of fat underneath the skin. When a turkey is not properly finished, it is inclined to be blue in color. Freezer burn frequently results from keeping the turkeys too long in storage, and light tom turkeys, such as Conzelmann had, are more subject to this than the heavier and better finished birds. During July and August of 1947, the Conzelmann flock suffered a severe infestation of worms and were treated therefor. Worms keep the turkeys from securing proper nourishment from their food. The Spath lot was in much better condition than that of the Conzelmanns.

Plaintiffs contended they had an offer in early February from Martindale of 48 cents per pound for their A grade turkeys, but that after his inspection of the turkeys, Martindale refused to buy them. No offer was ever made to Mrs. Spath by Martindale, and his proposition made to Mr. Conzelmann fell far short of being a firm offer. He told Conzelmann he would buy after his own inspection, if he found the birds to measure up to his needs. The principal reason he assigned for not purchasing was that the birds were not of the

size necessary to meet his requirements. He then needed and wanted heavier birds, and he was buying in carload lots. The Conzelmann turkeys averaged about 22 pounds each, while the Spath turkeys averaged about 23 pounds each.

On March 17, 1948, the plaintiffs agreed to sell, and the defendants agreed to purchase all the turkeys in storage at the agreed price of 45 cents per pound for A grade, 42 cents for B grade, and 39 cents for C grade, the number, weight, and grade to be based upon those of the turkeys originally delivered. Defendants were also to pay for shortages in weight as theretofore agreed upon.

According to Norton, but denied by plaintiffs, defendants also agreed on March 17 to protect plaintiffs on any rise in the market between then and March 30.

Norton directed that drafts be immediately drawn and delivered to plaintiffs to close the deal. Attached to each draft was a detailed statement, showing the pounds respectively of the A, B, and C grades, the total payment for each grade, and the deductions for processing and storage. In the Conzelmann draft was included an amount to cover the shortage in pounds before noted, and to Mrs. Spath was issued a separate draft for $66.46 to cover such shortage. The warehouse receipts were delivered to Norton.

At no time prior to March 17 had plaintiffs ever threatened to sue defendants for any wrong, real or fancied, which they claimed defendants to be guilty of, nor during the negotiations leading up to the final closing of the sale on March 17 did they in any manner indicate any dissatisfaction, nor did they even so much as intimate an intent and purpose on their part

to bring any sort of action against defendants after the transaction was completed.

When plaintiffs, after going outside for coffee while the drafts were being prepared, returned to defendants' plant, they picked up their drafts in the outer office and then proceeded to Norton's private office where, without a word of explanation to Norton, they placed on his desk two envelopes and immediately departed. It developed that these envelopes contained letters addressed to Northwest Poultry which had been prepared by plaintiffs' attorneys on that day and which plaintiffs had had in their possession during all the negotiations leading up to the final closing of the sale. The letter referring to the Conzelmanns read as follows:

"On behalf of E. F. Conzelmann we hand you herewith original warehouse receipt #A7379 of Northwestern Ice and Cold Storage Co., which purports to cover 615 boxes YT turkeys, 56,898 pounds. As you know this is not the weight of the turkeys that you admit should be credited to Mr. Conzelmann, the actual weight being 57,390 pounds.

"On behalf of Mr. E. F. Conzelmann this is to advise you that he is accepting your offer to purchase the turkeys above mentioned as graded by you on the basis of 45 cents for grade A turkeys, and a corresponding price for B and C grades. Please remit proceeds to First National Bank, Oregon City Branch, Oregon City.

"In accepting your offer to purchase these turkeys at 45 cents per pound for A grade and corresponding prices for B and C grade, *Mr. Conzelmann is not to be understood as waiving his claim against you for substituting turkeys for other than his own and intends to hold you responsible for all damages he has suffered by reason thereof.*" (Italics ours.)

In the Spath letter, 47,801 pounds are mentioned as the total poundage being sold. In substance, both letters are the same.

Here were written acceptances of the offer defendants had made to purchase, yet they were not called to defendants' attention nor delivered until the transaction had been completed. This extraordinary conduct on the part of plaintiffs is not explained. Common honesty demanded that this matter be brought to defendants' attention before the sale was completed and the drafts issued and delivered. Had plaintiffs followed that course which fair dealing indicated as necessary and proper, it is safe to assume no deal would have been made at that time.

From the statement attached to each draft it appears that defendants paid for the respective number of pounds set forth in the letters, as well as for the shortages in weight as noted.

Further observation is made of the fact that in these letters plaintiffs spoke only of damages caused by the substitution of other turkeys for those originally delivered. There is not one word about alleged fraud. Can it be that fraud was an afterthought? Inasmuch as plaintiffs were being paid on the basis of the turkeys originally delivered, there could have been no damage because of the substitution.

On March 18, plaintiffs deposited the drafts with the Oregon City bank for collection, and that bank forwarded them to the East Portland Branch of the First National Bank. According to Norton, it was the practice of Northwest Poultry to issue a master check each day for all drafts issued on that day.

However, after reading the letters deposited on his desk by plaintiffs, Norton refused to honor the

drafts at that time, though willing at all times to complete the settlement made March 17. He gave as his reason for not honoring the drafts that he "wasn't buying turkeys and a lawsuit at the same time."

On March 20, or three days later, plaintiffs agreed to sell, and E. L. Martindale agreed to purchase the Spath turkeys at 46 cents for the A grade, 44 cents for the B grade, and 40 cents for the C grade, *as graded by Northwest Poultry,* and the Conzelmann lot at the C grade price of 40 cents without reference to actual grade, and these sales were completed on March 26.

Admittedly, according to grading done by Fallihee in February, based upon U. S. Grade, there was substantially a large number of Conzelmann turkeys graded A, a large number graded B, and none graded less than C, and according to Northwest Poultry grading at which the Spath turkeys were sold, many more of the Conzelmann lot were graded A and B, yet the Conzelmanns sold the entire lot at the C grade price. The record is entirely silent as to why the Conzelmanns were willing to make this sacrifice, particularly when defendants were willing to go through with the settlement agreed upon on March 17. Can it be that the sole purpose was to lay the foundation for a claim of substantial damages in the action later to be commenced?

To collect their processing charges at the rate of $3.75 per cwt. from the Conzelmanns, defendants later commenced action in the Circuit Court for Clackamas county against those plaintiffs. The complaint alleged the total weight as 57,390 pounds and demanded judgment for $2,182.85. The demand was in error. It should have been for $2,152.13. Upon oral argument in this court and in plaintiffs' briefs, plaintiffs had much to

say about this obvious error—a simple mistake in multiplication—yet before trial in the lower court when defendants sought to amend their answer to explain this as a clerical error, plaintiffs' counsel objected and said: "this is not a case of whether they did or did not charge too much in a previous case or previous charge; *that that has absolutely nothing to do with this case.*" (Italics ours.) We agree with counsel. Plaintiffs paid the amount demanded in the Clackamas county case, and the action was dismissed. On the trial in this case Mrs. Spath admitted that she owed Northwest Poultry for processing 47,801 pounds of her turkeys at $3.75 per cwt.

The amended complaint in each of these cases contains a lengthy recital of the history of this transaction with numerous allegations that defendants' actions were in furtherance of a scheme on their part to defraud plaintiffs. All the essential elements of actionable fraud are pleaded. In addition to demands for actual damages allegedly suffered, punitive damages in the sum of $50,000 in each case are demanded.

In their answer in each case, defendants deny the alleged fraud and affirmatively claim that by reason of the settlement made on March 17, plaintiffs waived their right to sue for damages and are estopped to prosecute such claims.

■ Under the facts of this case, viewed in the light most favorable to plaintiffs, defendants were guilty of a wrongful conversion to their own use of the original turkeys delivered by plaintiffs to the Portland plant. Upon such conversion, plaintiffs' rights of action therefor were complete. But when plaintiffs with knowledge of such conversion agreed with defendants that the latter might and would replace such original

turkeys with others of like weight and grade, the wrongful conversion and any right of action based thereon were waived. There was a complete novation. Thereafter, the rights and obligations of the respective parties were governed entirely by the new agreement.

■ Comprehensively stated, the elements of actionable fraud consit of: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury. *Condit v. Bodding,* 147 Or. 299, 33 P. (2d) 240; *Howard v. Merrick,* 145 Or. 573, 27 P. (2d) 891; *Wheelwright v. Vanderbilt,* 69 Or. 326, 138 P. 857; 37 C. J. S., Fraud, 215, § 3.

■ Each of the essential elements of fraud must be proved, and the failure to prove any one or more is fatal to the cause of action. *Condit v. Bodding,* supra; 37 C. J. S., Fraud, 400, § 94.

■ Fraud is never presumed. On the contrary, there is a disputable presumption that a person is innocent of crime or wrong; (§ 2-407 (1), O. C. L. A.) and another disputable presumption that private transactions have been fair and regular (§ 2-407 (19), O. C. L. A.). The person alleging fraud has the burden of proving it, and it must be established by evidence that is clear, satisfactory, and convincing. It is not necessary that it be established by direct evidence, for in many cases that would be impossible, and it may be proved by circumstantial evidence of a clear and satisfactory character. *Horner v. Pleasant Creek Mining Corp.,* 165 Or. 683, 107 P. (2d) 989, 109 P. (2d) 1044; *Broad v.*

*Kelly's Olympian Co.,* 156 Or. 216, 66 P. (2d) 485; *Metropolitan Casualty Insurance Co. v. Lesher,* 152 Or. 161, 52 P. (2d) 1133; *Condit v. Bodding,* supra; *Howard v. Merrick,* supra; 37 C. J. S., Fraud, 393, § 94.

In the Conzelmann case, it is contended that the turkeys placed in storage were not of equal weight and grade to those originally delivered; and in particular, plaintiffs contend that the quality of the birds stored was inferior to their original lot. If this be true, and we may assume that it is, defendants were simply guilty of a breach of their contract to replace the original turkeys with others of like weight and grade, "turkey for turkey, pound for pound, grade for grade." For this breach, the Conzelmanns would have an action for damages—if they suffered any on that account.

The promise of defendants to make such replacements was an agreement to do something in the future. Because of their breach of contract in failing to fully perform, may it be inferred that at the time of making the promise they had no intent to carry out their undertaking?

■ It is well established that fraud cannot be predicated upon a promise to do something in the future, unless the person making the promise, at the time he made it, had no intention of performing. *Hansen v. Holmberg,* 176 Or. 173, 156 P. (2d) 571; *Bond v. Graf,* 163 Or. 264, 96 P. (2d) 1091; *Condit v. Bodding,* supra; *Sharkey v. Burlingame Co.,* 131 Or. 185, 282 P. 546; *Dolph v. Lennon's, Inc., et al.,* 109 Or. 336, 220 P. 161.

■ To amount to a fraudulent representation sufficient to constitute actionable fraud, the intention not to perform must exist at the time the promise to do something in the future is made, and such an intent formed later and carried into effect is insufficient.

Aside from their failure to strictly perform their agreement as to weight and quality, there is not a scintilla of evidence in the record from which it might reasonably be inferred that at the time of making the promise the defendants did not intend to fully and faithfully perform. On the contrary, the undisputed testimony tends to show the very opposite. The admitted standing offer of defendants to purchase these turkeys at any time plaintiffs wished to sell at the then market price is most persuasive, if not conclusive, as to their actual intent.

■ A fraudulent intent not to perform a promise may not be inferred as existing at the time the promise is made from the mere fact of nonperformance. Other circumstances of a substantial character must be shown in addition to nonperformance before such inference of wrongful intent may be drawn. *Cameron v. Edgemont Inv. Co.*, 136 Or. 385, 299 P. 698; *Dolph v. Lennon's, Inc., et al.*, supra; *Crosby v. Crescent Oil Co.*, 192 Minn. 98, 255 N. W. 853; *Cuckovich v. Buckovich*, 83 Mont. 1, 264 P. 930; *Leichner v. First Trust Co.*, 133 Neb. 170, 274 N. W. 475; *Downtown Chevrolet Co., et al., v. Niccum et al.*, 180 Okla. 616, 71 P. (2d) 957; *Fidurski v. Hammill*, 328 Pa. 1, 195 Atl. 3.

In *Cameron v. Edgemont Inv. Co.*, supra, at page 395, Mr. Justice Rossman stated the rule thus:

"It is, of course, elementary that the mere nonperformance of a promise made, or the failure to carry out an intention expressed, in the course of negotiations, is neither fraud nor evidence of fraud."

In the Spath case, the evidence shows a full performance by defendants of their agreement to replace the original turkeys with others of equal weight and

grade, except for the shortage in weight heretofore noted and explained. Mrs. Spath actually sold the turkeys based upon this weight and grade.

At the outset, as noted, defendants were guilty of a conversion, though in fairness to them it should be stated that they denied this wrong, and when Norton was on the witness stand, having been called by plaintiffs as an adverse witness, he explained the circumstances. According to his version, the plaintiffs did not make a request of defendants to store their tom turkeys until some time after they had been delivered, processed, eviscerated, and commingled with other lots. He pointed out that the Portland plant was not equipped to handle much more than 2,000 turkeys daily and had no storage space available. He also testified that it had long been the custom of defendants when turkeys were delivered without instructions to store them to immediately treat them as their own, paying the grower the market price without any deductions for transportation or processing. The plaintiffs knew of this practice and for several years had dealt with defendants on that basis.

In their amended complaints, plaintiffs repeatedly charge defendants with an intent to defraud them, yet the record wholly fails to disclose in what way defendants were to or did gain any financial or other material advantage over plaintiffs. Ordinarily, persons indulging in fraudulent conduct do so with a purpose in mind to gain some benefit for themselves.

■ We have carefully read the entire transcript of testimony, consisting of 600 typewritten pages, and have failed to find the slightest evidence of fraudulent conduct by defendants. On the contrary, the record fairly shouts with good faith and fair dealing on their part.

We agree with the able trial judge who, in passing on the motions for involuntary nonsuit, said:

"There is no substantial evidence, in my opinion, of any fraud in the original transaction. * * * To submit fraud in this case would be in my opinion to turn the jury loose in the field of suspicion, conjecture and speculation without the aid of any substantial evidence."

But irrespective of what has been said before, there is an additional reason why these actions must fail. We may assume that the defendants were guilty of fraud, but all the facts and circumstances connected therewith were fully known to plaintiffs on or before March 17, at the time they agreed to sell and defendants agreed to purchase both lots of turkeys at an agreed price. At that time a new contract was entered into between the parties, and on that day it was fully performed on both sides, with exception of the final payment of the drafts.

It is well established by the authorities that when one who has been induced by fraud to enter into a contract, subsequently, with knowledge of the fraud, enters into another agreement respecting the same transaction with the one guilty of the fraud, he, the injured party, thereby waives and relinquishes all right to damages on account of such fraud. If he receives some substantial concession from the one guilty of such fraud, he waives his right to insist further upon holding the wrongdoer responsible in damages for the fraud. *Anderson v. Laws,* 176 Or. 468, 159 P. (2d) 201; *Phillips v. Malone,* 223 Ala. 381, 136 So. 793; *Burne v. Lee,* 156 Cal. 221, 104 P. 438; *Bonded Adjustment Co. v. Anderson,* 186 Wash. 226, 57 P. (2d) 1046, 106 A. L. R. 166.

When the plaintiffs sold their turkeys to defendants on March 17, they received substantial concessions from defendants in that they were to be paid in full on the basis of the weight and grade of the turkeys originally delivered, and also for all shortages in weight, and both were relieved from paying interest on deferred payments due for processing and storage; and, in any event, they then entered into a new contract respecting the transaction.

In *Anderson v. Laws,* supra, Mr. Justice Lusk quoted with approval from 24 Am. Jur. as follows:

"In 24 Am. Jur., Fraud and Deceit, 42, § 214, it is said to be the general rule that 'if one induced by misrepresentations or fraud to deal or acquire, or to enter into a contract for the acquisition or use of property thereafter, with knowledge of the deception, receives from the party guilty of fraud some substantial concession or enters into a new contract in respect of the transaction, he thereby relinquishes all right to recover or recoup damages because of the misrepresentations.' So far as we have been able to ascertain, the validity of this principle has never been questioned by any court."

In that case the plaintiff claimed that he was defrauded in the purchase of certain stock. After learning of the fraud, plaintiff entered into an agreement with defendant that if plaintiff's stock should not be sold within a fixed time, the corporation would be liquidated, and plaintiff would be paid the purchase price of his original stock. Plaintiff brought an action of damages for the original fraud.

This court held that the evidence failed to create a question of fact for the jury on the issue whether

plaintiff in making the new agreement intended to waive his right to recover damages for the original fraud, saying:

> "It is true that the question whether one intends to waive a known right is usually one of fact, but in a case like this where the facts are not in dispute *the law conclusively presumes the intent from the person's conduct.*" (Italics ours.)

■ And so it is in the case at bar. The facts are not in dispute. Plaintiffs were fully cognizant of all the circumstances going to make up the alleged fraud and yet, with such knowledge, made no claims whatever against defendants on account thereof at the time of the sale on March 17, nor before that, and accepted the drafts in settlement without any intimation of their secret intention to press an action for damages for the alleged fraud. From this conduct on the part of plaintiffs, and as stated by Mr. Justice Lusk, "the law conclusively presumes the intent" to waive the right to damages for the fraud.

This conclusive presumption arose and was binding upon the plaintiffs when the new contract was made. The settlement of all differences between the parties was then complete; it became an integral part of the contract. It could not be defeated by later expressions to the contrary.

It is not necessary to the application of the principle announced in *Anderson v. Laws,* supra, that there be a performance of the new agreement.

In *Anderson v. Laws,* supra, plaintiff contended that the question of waiver was governed by the law of accord and satisfaction, and that, at most, the new agreement was an executory accord, not binding or

enforceable without satisfaction. Respecting that contention, this court said:

> "We think that the new arrangement, instead of being a mere executory accord, was rather, as the court said in Burne v. Lee, supra, 'what may be called a compromise agreement * * * under which the claim of plaintiff against the defendant was to be settled.'"

The failure of plaintiffs to reveal their secret intentions during the negotiations leading up to the final agreement amounted to a fraudulent concealment on their part of material facts. Because of this fraudulent concealment, plaintiffs are estopped to rely on the facts so concealed and the additional fact that the agreement made on that day was never performed.

From the allegations of the amended complaints in each case, it clearly appears that the theory of the pleader was an action for damages for fraud. The trial in the lower court proceeded on this theory. During the course of the trial in objecting to certain proffered evidence, counsel for plaintiffs said: "This is a fraud case, Your Honor, for fraudulent representations that were made * * *." In this court for the first time, plaintiffs contend that if their proof fell short of establishing actionable fraud, nevertheless, the allegations of the complaint and the evidence offered on the trial in support thereof were sufficient to submit the matter to the jury upon the theory of this being an action on the case.

We have given this phase of the matter careful consideration, but do not find anything in the record or in the authorities cited to support plaintiffs' contentions in the respects noted. We deem further discussion unnecessary.

The judgments are affirmed.