Submitted on appellant's brief December 14, 1955, affirmed
as modified February 15, 1956

## KOUFASIMES *v.* KOUFASIMES

293 P. 2d 200

*Glenn R. Jack* and *James O. Goodwin,* Oregon City,
for appellant.

No appearance for respondent.

ROSSMAN, J.

This is an appeal by the plaintiff (wife) from a
decree of the circuit court which dissolved the bonds

of matrimony that had united the parties in wedlock and which also made distribution of most of the property, real and personal, which the two had acquired. The single exception was the household furniture. The decree granted the plaintiff-appellant no alimony. Upon appeal, she does not attack the parts of the decree which awarded to her the divorce. Her dissatisfaction is with the provisions which pertain to the property distribution. More particularly she is dissatisfied with the omission to grant her alimony and the household goods.

The couple were married in 1937 when the plaintiff (wife) was 53 years of age and the defendant was 41. At that time the plaintiff lived in a small hut adjacent to the business district of Oswego. A witness referred to the little hovel as a shack. It stood upon a lot 50 by 120 feet in size. She paid for the property $250. The defendant, who was born in Greece, worked as a laborer with a section crew that laid track for a railroad. He still followed that occupation at the time of the trial but had advanced to the rank of foreman. The plaintiff's wretched dwelling, which lacked even the convenience of running water, became the couple's place of abode when they were married.

This case constitutes another chapter in the simple annals of the poor. It has, however, a modern touch given it by the fact that, a few months before the plaintiff's application for a divorce, the couple purchased a secondhand automobile and at other times embraced the installment method of payment.

Notwithstanding the singular age disparity between husband and wife, the marriage was successful for 17 years. In those years the harmony which attended their relationship was interrupted only by occasional minor

misunderstandings. The defendant, in mentioning the fact that during those years his wife did not argue with him and he employed no provocative words in discussing matters with her, concluded in this vein: "Yes. Before, honest to God, for seventeen years, never say a word; I never say a word at all." He meant, of course, that neither argued with the other.

In those 17 years thrift, industry and lack of domestic bickering enabled the couple to add materially to the meager financial resources with which their matrimonial venture was begun. It is clear that neither was afraid of hard work and both toiled to accumulate something for old age. The plaintiff, before her marriage, had engaged in such menial tasks as the scrubbing of floors, and the defendant, while upon the witness stand, in order to evidence the hard labor by which he earned his daily bread, punctuated his testimony with these ejaculations: "Look at my hands, look at there" and "Look at my hands, look over here."

Through the couple's toil, the hut, which became their home upon marriage and which the defendant described as "only four walls," was expanded and materially improved. Its mud sill foundation was replaced in part with a crude concrete foundation constructed by the defendant. Two rooms were added to the little structure and whereas it originally lacked the prime necessity of running water, it had by the time discord brought the couple to the divorce court, the luxury of a bathroom. Evidently the little habitation did not originally have even a chimney, for the defendant mentioned with pride more than once that he built for it a brick chimney. The house in fact had undergone such material overhauling through the couple's industry that it was producing $40 a month rent at the

time of the trial. Since the plaintiff owned the property before the marriage, both she and the defendant referred to it as hers although the defendant avowed an "understanding" that he was entitled to an interest in it. The property is situated upon Second street in a business zone of Oswego. A competent appraiser estimated its value as $4,500 to $5,000.

After the couple had improved the Second street property the defendant purchased eight lots totaling in area 120 by 208 feet on Third street in Oswego. Upon it they erected a dwelling house. It seems that the defendant was both architect and builder of the structure, but his competence in those vocations evidently was not as impressive as the determination with which he pursued the project. The appraiser whom we have mentioned, after going through the house, described it in this way: "Oh, it's nothing that you'd come up and brag about; * * * it's good enough, I guess." In its erection the defendant used whatever scrap materials came to hand and in the construction work was helped by the plaintiff. The appraiser estimated the value of the lots and house at $7,500. It required the couple four years to complete the house. In 1947 they moved into it and thereupon rented to tenants the Second street property.

While the parties were improving their properties in the manner just described they began a systematic plan of saving whereby they purchased, every three months, a government savings bond of the maturity value of $25. They possessed 48 of them at the time of the trial. The plaintiff, who had been married before, was the mother of four children one of whom died while serving with the armed forces. On account of his death she received for a while a pension of $40 monthly,

but when good fortune had rewarded the couple's industry she had the pension stopped upon the defendant's request. A few months before the trial they purchased a secondhand automobile for the sum of $1,350. An initial payment of $600 was made upon the purchase price. The plaintiff, in speaking of her husband's ability to handle the car, described it in this vein: "He was steering it around the streets, if you call it driving; I'd like to know what you call it."

We see from the foregoing that thrift, toil and the keeping of a tight leash upon the tongue advanced the material interests of the couple to the point where they had the luxuries of an automobile, a brick chimney and a bathroom. Then came a by-product of the taxation era in which we find ourselves—a tax refund. Although the couple's matrimonial bark had ridden with safety and equanimity over all previous troubled waters, it proved incapable of coping with the benefaction of the tax refund. The plaintiff testified:

"Q  Now, this check, Mrs. Koufasimes, you said that that started your trouble. What is that for?

"A  Well, that's return back off of the taxes.

"Q  Federal taxes?

"A  Yes. Last year when it come, why he had me sign it, and he cashed it; this year, I asked him to sign it and me cash it, and he pounded on my wrist and broke my watch, and you can see how crooked my wrist is from the fix of it."

The defendant, without challenging his wife's account about the source of that item of dissension, gave a different account of the origin of the couple's discord. It, too, centered in the circumstance that husband and wife had accumulated property. When they struggled with want and adversity, their mutual hankering to get

something for old age held them together, but when the goal had been reached, the prospect of a division of the spoils drove them apart. According to the defendant, domestic strife entered their home one day when the plaintiff's daughter (by a previous marriage) paid them a visit and began to talk to her mother about the wisdom of preparing a will. When the defendant received an inkling that the daughter's ideas contemplated that the Second street property should be bequeathed to her, trouble began. Seemingly, from that day on the defendant became suspicious of his wife and fearful that he was going to be stripped of his property. In turn, the plaintiff began to surmise that her husband was planning a visit to his native Greece and that somewhere he was secretly building up a cache for that purpose. When he found himself under suspicion, the defendant before long began to reason that his wife had a goodly sum of money in a safety deposit box or other repository. The suspicion and distrust upon which it fed caused bickering and discord. Upon the trial came the denouement. The following quotation from the plaintiff's testimony tells the story:

"Q Did you keep any money in the postal savings?

"A Yes.

"Q How much money do you have there?

"A If he don't tell how much he's got in the bank, I don't tell how much I got.

"THE COURT: Answer the question.

"MR. JACK: Answer the question, please.

"A I don't know.

"MR. GRANET: Q Now, if I guarantee you that Mr. Koufasimes will tell what he has, will you tell?

"A Yes.

"MR. GRANET: We will guarantee that on the record that Mr. Koufasimes will bring all the bank books we have.

"A His bank books ain't no good.

"THE COURT: Mrs. Koufasimes, if you know how much money you have in the postal savings, you must tell; answer the question.

"A I don't know exactly. It's been a long time since I put money in there, and I couldn't tell you exactly how much is in there.

"MR. GRANET: Q Well, is it $10,000?

"A No.

"Q Is it $7,500?
"A No.

"Q Is it $5,000?
"A It's not even $1,000; it ain't $300.

"Q Well, just say so, then.
"A Well, —

"Q Is it less than $300. Is that what it is?
"A Yes."

It later developed that the defendant had about $65 in a bank account.

Such is the story which is unfolded by this record. It shows that the marriage which brought the husband and wife happiness and prosperity fell asunder and yielded discord when their thrift and industry had won for them the goals which they envisioned about the time of their marriage.

All that now remains to be done is to determine whether or not the plaintiff should have been given some alimony and the household furnishings. We add that at the time of the marriage the plaintiff possessed, in addition to the Second street property, a sum of money approximating $800. The defendant at that time had nothing but his calloused hands.

The decree divided the couple's property in this manner:

| To plaintiff-appellant | Value | |
|---|---|---|
| Four of the eight lots acquired during the marriage | $2,000 to $2,400 | |
| 24 of the $25 U. S. savings bonds | | 600 |
| Postal savings account (previously plaintiff's sole property) | | 300 |
| The Second street property (previously plaintiff's sole property) | 4,500 to | 5,000 |
| To defendant-respondent | Value | |
| The Third street house and 4 lots | 5,100 to | 5,500 |
| 24 of the $25 U. S. savings bonds | | 600 |
| The automobile | 600 to | 900 |

The plaintiff will receive in 1956 a bequest of $1,000 from her deceased mother's estate. The defendant mentioned while testifying that his employer deducts from his wages a contribution toward an eventual retirement allowance; therefore, we assume that he will upon retirement receive a monthly allowance. That provision for his old age is, of course, an asset of material value.

We believe that the omission to award to the plaintiff the household furnishings was an inadvertence. The furnishings and furniture which are of modest value will be awarded to her.

A divorce court is granted a broad range of discretion by ORS 107.100 to award to the party favored by the decree ''the recovery from the party at fault such an amount of money, in gross or in installments or both, as may be just and proper for such party to contribute to the maintenance of the other.'' The exercise of that power and the discretion necessitated thereby are illustrated by *Polanski v. Polanski,* 193 Or

429, 238 P2d 739; *Shields v. Bosch,* 190 Or 355, 224 P2d 560; *Siebert v. Siebert,* 184 Or 496, 199 P2d 659; *Strickland v. Strickland,* 183 Or 297, 192 P2d 986; *Simpson v. Simpson,* 154 Or 396, 60 P2d 936; *Blake v. Blake,* 147 Or 43, 31 P2d 768.

How to employ the discretion demanded by ORS 107.100 is always a difficult, delicate and solemn problem. Its exercise often requires the chancellor to have a more intimate knowledge of the parties and their attendant circumstances than the record affords. In the present instance, we cannot close our eyes to the defendant's plea, ''look at my hands, look over here.'' Those horny hands were the source of much of the accumulations which the circuit court's decree distributed. The defendant, no doubt, had looked forward to the day when the property for which he had worked in the hot sun and winter cold would help take care of him. It is hard to deprive him of any of that property. Upon the other hand, the defendant chose as his bride a woman who was twelve years older than himself and who on the day of the trial was 71 years of age. She, too, uttered a plea during the trial to which the conscience of the chancellor must give heed; it is: ''Who's going to take care of me when I get old?'' The days in which she could earn her livelihood ended some years ago. We think it is probable that she helped the defendant not only to accumulate the properties which we have mentioned, but also to improve his status as a track layer whereby he has become a foreman and receives monthly take-home pay in the average amount of $200. When he reaches the present age of his wife he can retire with an assured income.

■ According to our belief, the decree should be amended to provide $50 per month as permanent ali-

mony for the plaintiff until such time as a change in her material circumstances occurs.

Apart from the two specified amendments, the decree is affirmed.

Affirmed as modified.

LATOURETTE, J., did not participate in this decision.