Argued and submitted November 7, 1986, affirmed February 25, 1987

# TEAGUE MOTOR COMPANY,
*Appellant,*

*v.*

# ROWTON et al,
*Respondents.*

## (148,988; CA A37654)
733 P2d 93

Dale L. Crandall, Salem, argued the cause for appellant. With him on the briefs was Crothers, Crandall & Evans, P.C., Salem.

Kristin E. Olsen, Salem, argued the cause for respondents. On the brief was Eric W. Olsen, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

This is an action by Teague Motor Company (Teague) for the balance due on the installment sale of a used car. Defendants counterclaim, alleging violations of the Unlawful Trade Practices Act (UTPA). After trial to a jury, judgment was entered on the counterclaim against Teague for general and punitive damages, and it appeals.

On February 8, 1984, defendants went to Teague to look at used cars. Defendants told Teague's salesman that they were looking for a car that would get good gas mileage and that had monthly payments of not more than $150. After showing defendants various cars, the salesman directed them to a 1981 model. He opened the hood and told them that the car had a four-cylinder engine, which would save them money on gasoline. The salesman told them that, with a $1,000 down payment and their pickup truck as a trade-in,[1] monthly payments would be $225, and that that amount would meet their needs, because the lower gasoline cost would save them the extra $75 per month over the desired monthly payment amount.

When defendants returned to Teague the next day, they were told that the down payment would have to be $1,500 instead of $1,000. They signed a "Retail Order for a Motor Vehicle" which reflected the changed amount. Teague's sales manager, Batdorf, prepared a retail installment contract that defendants understood would allow Teague to arrange financing. The contract provided that the entire balance would be due February 11, two days later. Batdorf told defendants that they could take the car as soon as they had signed the contract, while he arranged financing. They signed and drove the car home.

The next day, defendants learned that the car had an oil leak and that it had a six-cylinder instead of a four-cylinder engine. They went to Teague and told Batdorf of the oil leak problem and the salesman's representation that the car had a smaller engine than it actually had and attempted to return the car. Batdorf responded that, although Teague would agree to pay off the debt on defendants' trade-in, fix a "miss" in the

---

[1] The pickup was valued at less than the amount defendants still owed on it; therefore it added to rather than reduced the amount to be financed.

engine and warrant the car's engine, nevertheless defendants had already purchased the car, the full price was due under the contract, and Batdorf had already obtained financing for them. The financing arrangement provided for a down payment of $2,000, which was financed by an outside finance company at 40 percent interest and resulted in total monthly payments of over $300. When defendants replied that none of that would help, because the payments would be too high, they were told that they had a contract which they needed to take care of and that they had bought the car. Defendants signed the installment contract and took the car. When they failed to make the payments, Teague commenced this action.

Defendants counterclaimed, alleging violations of ORS 646.608, which provide, in pertinent part:

"(1) A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(e) Represents that * * * goods * * * have * * * uses, benefits * * * or qualities that they do not have * * *.

"* * * * *

"(k) Makes false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred."

The jury returned a verdict for defendants on the counterclaim and awarded general damages of $4,716.76 and punitive damages of $15,000.

Teague raises six assignments of error, which relate to three issues. First, it argues that defendants waived their right to bring an action for misrepresentation when they signed the final contract. It relies on this proposition:

"It is well established by the authorities that when one who has been induced by fraud to enter into a contract, subsequently, with knowledge of the fraud, enters into another agreement respecting the same transaction with the one guilty of the fraud, he, the injured party, thereby waives and relinquishes all rights to damages on account of such fraud. If he receives some substantial concession from the one guilty of such fraud, he waives his right to insist further upon holding

the wrongdoer responsible in damages for the fraud." *Conzelmann v. N.W.P. & D. Prod. Co.,* 190 Or 332, 354, 225 P2d 757 (1950). (Citations omitted.)

Defendants respond that there was no new agreement for additional consideration, because the final contract document was signed as a culmination of the deceptive transaction; therefore, the *Conzelmann* principle does not apply.

*Lackey v. Ellingsen,* 248 Or 11, 432 P2d 307 (1967), cited by defendants, is instructive. There, an offer to fix a roof, the condition of which had been misrepresented, was made in response to the plaintiff's complaint about the misrepresentations. The court said that the plaintiffs did not waive their right to damages for the misrepresentation, because there was "no intention to form a new contract and, in effect, to erase the consequences of the misrepresentation"; the offer was merely an attempt by the defendants to make good the condition represented by them. 248 Or at 15.

■     Although this case differs factually, the principle remains the same. The final document that defendants signed, which increased their down payment from the agreed $1,500 to $2,000 and contained an arrangement for paying off the trade-in vehicle, was not "another agreement respecting the same transaction," as the phrase is used in *Conzelmann.* In obtaining defendants' signatures on the final document, Teague never acknowledged or attempted to make good the misrepresentation. Instead, its sales manager continued the deceptive tactics by insisting that defendants agree to additional disadvantageous changes in the terms of the originally negotiated agreement and by obtaining financing of the increased down payment at the unusually high rate of 40 percent interest. Although the sales manager agreed that Teague would fix a "miss" in the engine, warrant the engine and pay off the trade-in, those actions were not a retreat from, or an attempt to, rectify the damage caused by the misrepresentations. The final document was merely the last step in an ongoing deception that resulted in defendants' acceptance of a vehicle that they knew they did not want and could not afford. Defendants did not waive their right to sue.

■     Here, even if we were to accept Teague's argument that defendants' agreement to purchase the car was made after they had knowledge of all the misrepresentations of fact,

it was, nevertheless, not entitled to a directed verdict. The protection of the UPTA is not limited to fraud. It also provides a remedy for deceptive practices, including misleading representations concerning the nature of the obligation incurred. Teague, throughout this transaction, misled defendants about the nature of their obligation by telling them that they were bound by the contract despite the difference between the represented and actual condition and qualities of the car and despite the changed credit terms.[2]

Teague also argues that parol evidence of the misrepresentations should have been excluded, because the "Retail Order for a Motor Vehicle," signed by defendants, included a merger clause that provided that "[a]ny and all representations * * * or statements by seller's agent that differ in any way from the terms of this written agreement shall be given no force and effect." In transactions such as this, parol evidence is governed by ORS 72.2020:

> "Terms * * * which are * * * set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement * * *."

██ ██ That rule, however, does not preclude evidence of fraud or misrepresentation that occurs as an inducement to enter a contractual relationship. *See Curtis v. Golden,* 55 Or App 400, 637 P2d 1374, *rev den* 292 Or 581 (1982) (referring to ORS 41.740, the general parol evidence rule).[3] Here, defendants are not suing to enforce a contract which is different from the terms of the writing. They are claiming that misrepresentations resulted in the written agreement. It would be

---

[2] Teague's underlying proposition seems to be that, once the original salesman leaves the scene and the prospective buyer is turned over to the sales manager, any misrepresentations which the salesman may have made are negated and the transaction starts anew. Thus, the only pertinent facts arise after the buyer is introduced to the sales manager. We do not accept the proposition. The salesman and the sales manager are both involved in one transaction, and one cannot wipe out the actions of the other merely by taking over the negotiations.

[3] ORS 41.740 specifically provides that it does not exclude parol evidence to establish fraud. The same reasoning applies under ORS 72.2020. The purpose of the parol evidence rule is to preclude one party from varying the terms of a written agreement by attempting to show that the agreement was not as the writing indicates. That is a different question from whether evidence of precontractual negotiations may be admitted to show that misrepresentations were made to induce entry into a contract.

absurd to disallow as proof of an unlawful trade practice evidence of the very precontractual oral misrepresentations on which the claim is based. Thus, the merger clause does not insulate Teague from a claim of misrepresentation under the UTPA.

■    Finally, Teague argues that punitive damages were improperly awarded, because (1) the menial agent rule applies in claims for punitive damages under the UTPA and (2), even if it does not, the evidence was insufficient to justify the jury's award. Punitive damages may be awarded for violations of the UTPA, ORS 646.638(1), but only when the common law requirements for punitive damages are met. *Crooks v. Payless Drug Stores,* 285 Or 481, 490, 592 P2d 196 (1979). When the UTPA was enacted in 1971, the common law of punitive damages provided that a corporation was "not liable in punitive damages for the wrongful act of its menial agent unless such act was authorized or ratified." *Pelton v. Gen. Motors Accept. Corp.,* 139 Or 198, 204-05, 7 P2d 263, 9 P2d 128 (1932). In 1975, the Supreme Court specifically rejected the menial agent rule, *Stroud v. Denny's Restaurant,* 271 Or 430, 437, 532 P2d 790 (1975), and adopted instead the rule that a corporation may be liable for punitive damages if the employe is acting within the scope of his employment when he commits an act which would subject him personally to punitive damages.

■    Teague contends that the 1971 enactment of the UTPA and its provision for punitive damages "crystallized" the common law rule as it stood in 1971 into "static, statutory criteria," thus preserving the menial agent rule. We disagree. Although the issue of "crystallization" was not directly before it, in *Allen v. Morgan Drive Away,* 273 Or 614, 616, 542 P2d 896 (1975), the Supreme Court stated that the menial agent rule is no longer applicable in UTPA cases. Punitive damages were properly awarded.

Teague's contention that its actions were not aggravated enough to support an award of punitive damages is wholly without merit. *2-D's Logging v. Weyerhaeuser,* 53 Or App 677, 632 P2d 1319, *rev den* 292 Or 109 (1981); *see also Friendship Auto v. Bank of Willamette Valley,* 300 Or 522, 716 P2d 715 (1986). The jury properly was allowed to consider and award punitive damages.

Affirmed.